Nos. 25-13007, 25-14131

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

ALABAMA STATE CONFERENCE OF THE NAACP, et al.,
*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE FOR THE STATE OF ALABAMA,
*Defendant-Appellant*.

◆

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:21-cv-1531

## SECRETARY OF STATE'S EMERGENCY MOTION TO VACATE INJUNCTIONS IN LIGHT OF *LOUISIANA V. CALLAIS* AND FOR THE IMMEDIATE ISSUANCE OF THE MANDATE, OR, IN THE ALTERNATIVE, TO STAY THE INJUNCTIONS
### (Relief Requested by May 8, 2026)

Michael P. Taunton
Riley Kate Lancaster
BALCH & BINGHAM LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com

Steve Marshall
 *Attorney General*
A. Barrett Bowdre
 *Solicitor General*
Robert M. Overing
 *Principal Deputy*
  *Solicitor General*
James W. Davis
 *Deputy Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36104
(334) 242-7300
Barrett.Bowdre@AlabamaAG.gov

*Counsel for Secretary of State
Wes Allen*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1. ACLU of Alabama

2. Aden, Leah C.

3. Alabama Attorney General's Office

4. Alabama State Conference of the NAACP

5. Allen, Amanda N.

6. Allen, Hon. Wes

7. American Civil Liberties Union

8. American Civil Liberties Union Foundation

9. Ashton, Anthony

10. Balch & Bingham LLP

11. Barnes, Anna-Kathryn

12. Bowdre, A. Barrett

13. Burke, Colin

14. Burrell, Ashley

15. Campbell-Harris, Dayton

16. Carter, Brittany

17. Chandler, Laquisha

18. Davis, James W.

19. Douglas, Scott

20. Duggan, Matthew R.

21. Dunn, David

22. Ebenstein, Julie A.

23. Ellsworth, Jessica L.

24. Ettinger, James W.

25. Faulks, LaTisha Gotell

26. Gbe, Harmony R.

27. Geiger, Soren A.

28. Genberg, Jack

29. Greater Birmingham Ministries

30. Harris, A. Reid

31. Hattix, Laurel Ann

32. Heard, Bradley E.

33. Hogan Lovells US LLP

34. Jackson, Sidney

35. LaCour Jr., Hon. Edmund G.

36. Lakin, Sophia Lin

37.    Lancaster, Riley K.

38.    Lawsen, Nicki

39.    Lee, Theresa J.

40.    Livingston, Sen. Steve

41.    Manasco, Hon. Anna M.

42.    Marshall, Hon. Steve

43.    Mauldin, Dylan L.

44.    Maze, Hon. Corey L.

45.    McClendon, (former) Sen. Jim

46.    McKay, Charles A.

47.    Merrill, Hon. John H.

48.    Messick, Misty S. Fairbanks

49.    Milligan, Evan

50.    Mink, Richard D.

51.    Mollman, Alison

52.    NAACP Legal Defense and Educational Fund, Inc.

53.    NAACP Legal Defense Fund

54.    Naifeh, Stuart

55.    National Association for the Advancement of Colored People

56.    Newsom, Hon. Kevin C.

57. Olofin, Victor

58. Overing, Robert M.

59. Pringle, Rep. Chris

60. Rosborough, Davin

61. Ross, Deuel

62. Sadasivan, Kathryn

63. Seiss, Benjamin M.

64. Shapiro, Avner

65. Short, Caren E.

66. Simelton, Benard

67. Smith, Brenton M.

68. Southern Poverty Law Center

69. Stewart, Shelita M.

70. Stone, Khadidah

71. Taunton, Michael P.

72. Thomas, James

73. Thompson, Blayne R.

74. Turrill, Michael

75. Unger, Jess

76. van Leer, Jacob

77.     Walker, J. Dorman

78.     Wallace, Janette McCarthy

79.     Weisberg, Liza

80.     Welborn, Kaitlin

81.     Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC

82.     Wilson, Thomas A.

83.     Woodard, J. Scott

No publicly traded company or corporation has an interest in the outcome of the case or appeal

Respectfully submitted this 4th day of May, 2026.

<u>s/ A. Barrett Bowdre</u>
A. Barrett Bowdre
*Counsel for Secretary of State Wes Allen*

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .......................................................... 1

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

ARGUMENT ............................................................................................................ 5

    I.      The District Court's Injunctions Cannot Survive *Callais* ................................................................................................ 6

        A.      The District Court's Application of §2 Conflicts With *Callais*. .................................................................... 6

        B.      The District Court's *Gingles* Analysis Conflicts With *Callais*. .................................................................... 8

            1.   The district court's *Gingles* 1 holding conflicts with *Callais* because the court did not require Plaintiffs to draw maps race blind or meet "all" the State's legitimate redistricting objectives. ..9

            2.   The district court's *Gingles* II and III holdings conflict with *Callais* because the court did not require Plaintiffs to "disentangle" race and political affiliation. ....................................................12

            3.   The district court's totality-of-the-circumstances holding conflicts with *Callais* because the court did not focus on evidence of "present-day intentional racial discrimination regarding voting." .......................................................................13

    II.     The Equities Require Quick Relief. ................................................... 14

CONCLUSION ....................................................................................................... 16

CERTIFICATE OF COMPLIANCE ...................................................................... 17

CERTIFICATE OF SERVICE .............................................................. 18

APPENDIX ...................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Louisiana v. Callais*,
  Nos. 24-109 & 24-110, (U.S. Apr. 29, 2026) .................................. 1, 2, 4, 5, 6, 7,
  ............................................................... 8, 9, 10, 11, 12, 13, 14, 15, 19, 20

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ...................................................................5, 14

*Thomas v. Att'y Gen., Fla.*,
  795 F.3d 1286 (11th Cir. 2015) ...........................................................................5

*Thornburg v. Gingles*,
  478 U.S. 30 (1986)............................................................... 1, 6, 8, 9, 11, 12, 19

**Other Authorities**

Alabama Secretary of State, Administrative Calendar, 2026 Statewide Election,
  https://www.sos.alabama.gov/sites/default/files/election-
  2026/AdminCalendar%20-2026.pdf.....................................................................3

Proclamation by Governor Kay Ivey (May 1, 2026),
  https://governor.alabama.gov/newsroom/2026/05/2026-first-special-session-
  proclamation.................................................................................................3, 15

# INTRODUCTION

This is an appeal of the district court's injunctions entered under Section 2 of the Voting Rights Act (1) prohibiting the Alabama Secretary of State from conducting elections pursuant to the State's 2021 Plan for its Senate districts and (2) requiring the Secretary to use instead a court-ordered map that created an additional majority-black Senate district. *See* DE274 ("Op."), 322 (remedial map).[1] After denying the Secretary's motion to stay the injunctions pending appeal, CA11.DE51-2, this Court stayed appellate proceedings "until a decision is issued in *Louisiana v. Callais*" by the Supreme Court, CA11.DE61-1. As the Secretary noted at the time, the Supreme Court's decision would "likely address the ongoing validity or contours of the *Gingles* test and the appropriateness of race-based remedies, such as the one the district court required in this case." CA11.DE56:3.

So it did. Last Wednesday, the Supreme Court issued its decision in *Callais* and "update[d] the *Gingles* framework" to "realign it with the text of §2 and constitutional principles." *Louisiana v. Callais*, Nos. 24-109 & 24-110, slip op. 29 (U.S. Apr. 29, 2026) ("*Callais* Op."). The updates were significant, both in general and for this case. For instance, where the district court began its inquiry by noting that "[i]ntent is not an element of a Section Two violation," Op.13, *Callais* held that "the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on

---

[1] Docket entry ("DE") and Op. citations are to the ECF-stamped pagination.

*intentional* racial discrimination," *Callais*.Op.23, and each step of the test must be oriented toward that end, *id.* at 29-31, 33-35. Likewise, where the court below found that race did not "predominate" in Plaintiffs' illustrative maps even though the map-drawer "reviewed race at the beginning of the process to see 'where the minority community exists'" and thereafter "checked the minority BVAP" "periodically," Op.173, the Supreme Court made clear that "an illustrative map in which race was *used* has no value in proving a §2 plaintiff's case," *Callais*.Op.29 (emphasis added). And where the district court assumed that "the second and third *Gingles* precondi-tions do not require that the Court disentangle party and race," Op.183, the *Callias* Court squarely held that "disentangling race and politics" is "critical" to "the second and third preconditions," *Callais*.Op.30 (alteration omitted).[2] The injunctions cannot stand after *Callais*.

Alabama seeks emergency relief now because it should have the same oppor-tunity as other States to use a lawfully enacted map free of an injunction that cannot be reconciled with §2 "as property construed," *Callais*.Op.3. Accordingly, this Court should either (1) vacate the injunctions and immediately issue its mandate or (2) stay the injunctions. Either way, the Secretary respectfully asks this Court to act quickly.

---

[2] For more examples, see the Appendix to this motion.

While Alabama's primary election is currently set for May 19,[3] the Governor has called the Legislature into a special session beginning *today*—May 4—"to consider legislation to provide for a special primary election for electing members of … the Alabama State Senate in districts whose boundary lines are altered by a court issuing a judgment, vacating an injunction, or otherwise ordering or permitting an alteration in the boundaries of such districts."[4] **The Secretary thus respectfully requests a ruling on or before May 8**. The Secretary suggests that Plaintiffs' response be filed by 12 p.m. on May 6 and any reply be due by 10 a.m. on May 7.

## BACKGROUND

In 2024, the district court held a trial to determine whether Alabama's 2021 Plan violates §2 for failing to add additional majority-black Senate districts in the Huntsville and Montgomery areas. On August 22, 2025, the court held that Plaintiffs failed to establish a §2 violation near Huntsville but established a violation near Montgomery. Op.3-4. The court thus permanently enjoined the Secretary of State from conducting future elections under the 2021 Plan and ordered remedial proceedings for a new plan. Op.4-5. The court set a soft racial target for its remedy: a plan

---

[3] *See* Alabama Secretary of State, Administrative Calendar, 2026 Statewide Election, https://www.sos.alabama.gov/sites/default/files/election-2026/AdminCalendar%20-2026.pdf.

[4] Proclamation by Governor Kay Ivey (May 1, 2026), https://governor.alabama.gov/newsroom/2026/05/2026-first-special-session-proclamation/.

that "include[s] an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it." Op.5.

The Secretary appealed the court's ruling regarding Montgomery and asked this Court for a stay pending appeal, which this Court denied on October 30, 2025. CA11.DE51-2. The district court held remedial proceedings, and on November 17, 2025, ordered the Secretary "to administer Alabama's 2026 and 2030 state Senate elections, as well as any special and other elections for the state Senate that occur before the Legislature passes a districting plan based on the 2030 census, according to" a remedial map that adjusted the boundaries of Montgomery-area Senate Districts 25 and 26 to make both districts "Black-opportunity districts." DE322:25.

The Secretary appealed the affirmative injunction, moved to consolidate the appeals, and asked this Court to hold both appeals in abeyance until the Supreme Court issued its opinion in *Callais*. "No matter how the Supreme Court decides that case," the Secretary said, "it will provide guidance about how Section 2 should apply here." CA11.DE.60:10. On February 12, the Court consolidated the appeals and stayed the cases "until a decision is issued in *Louisiana v. Callais*." CA11.DE61-1. The Supreme Court issued its decision in *Callais* on April 29.

**ARGUMENT**

This Court will vacate and remand a lower court's decision when the lower court "applie[s] the law extant at the time it considered" the case, but "since the district court issued its order," a "subsequent case[] in the Supreme Court" "substantially altered the landscape." *Thomas v. Att'y Gen., Fla.*, 795 F.3d 1286, 1291 (11th Cir. 2015). Alternatively, when analyzing whether to stay an injunction pending appeal, this Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020) (quotation omitted).

Both sets of requirements are met here. Even assuming the district court properly applied "the law extant at the time it considered" the case, *Thomas*, 795 F.3d at 1291, the *Callais* Court expressly rejected the interpretations of §2 the court relied on. Its injunctions cannot survive *Callais*, making immediate vacatur proper and nearly guaranteeing the Secretary's likelihood of success on the merits in these appeals. As for the equities, without immediate action by this Court, Alabama will lack any opportunity to conduct the upcoming elections pursuant to its lawfully enacted map and will instead be forced to use a map that *Callais* makes clear is an

5

unconstitutional racial gerrymander whose "use would violate [voters'] constitutional rights." *Callais*.Op.35.

## I.      The District Court's Injunctions Cannot Survive *Callais*.

*Callais* upended every test the district court applied to impose its injunctions. Whether the *Callais* Court "updated [the] *Gingles* framework" (as the majority put it, *Callais*.Op.33) or radically "transform[ed] it" (as the dissenters said, *id.* at 23 (Kagan, J., dissenting)), the upshot is the same: Even if the district court perfectly applied §2 precedent as it existed before *Callais*, that precedent can no longer support the court's injunctions. *See* Appendix (providing chart comparing *Callais* and district court opinion)

### A.      The District Court's Application of §2 Conflicts With *Callais*.

In *Callais*, the Supreme Court considered a challenge to Louisiana's congressional districts following the 2020 census. A district court had found that the State's first post-census map likely violated §2 because it did not include an additional majority-black district. *Callais*.Op.1. "But when the State drew a new map that contained such a district, its new map was challenged as a racial gerrymander" under the Equal Protection Clause, and a three-judge court agreed. *Id.* at 1-2. Louisiana appealed to the Supreme Court, which took the opportunity "to resolve whether compliance with the Voting Rights Act" can provide a "compelling reason for race-based districting" of the sort Louisiana engaged in. *Id.* at 2. The Court's answer?

6

"Compliance with §2, *as properly construed*, can provide such a reason," but "[c]orrectly understood, §2 does not impose liability at odds with the Constitution, and it should not have imposed liability on Louisiana for its 2022 map." *Id.* at 3.

To explain what §2 "as properly construed" means, the Court began with the text of the Fifteenth Amendment and §2 of the VRA and held that "the focus of §2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Callais*.Op.23. "While that interpretation does not demand a finding of intentional discrimination," the Court explained, §2 "imposes liability only when the circumstances give rise to a strong inference that intentional discrimination occurred." *Id.* The Court gave an example of when such an inference would be proper: when "application of a State's districting algorithm yields numerous maps with districts in which the members of a minority group constitute a majority" and the "State cannot provide a legitimate reason for rejecting all those maps and eliminating all majority-minority districts." *Id.*

Under *Callais*, Plaintiffs challenging a state map thus have the burden of "disentangl[ing] race from politics," which they can do only "by offering an alternative map that achieves all the State's objectives—including partisan advantage and any of the State's other political goals—at least as well as the State's map." *Id.* at 25 (quotation omitted). "Properly understood," the Court concluded, "§2 thus does not intrude on States' prerogative to draw districts based on nonracial factors." *Id.* at 24.

7

The district court interpreted §2 differently. The court eschewed evidence suggesting (or dispelling) racial intent because "[i]ntent is not an element of a Section Two violation," Op.13, and focused instead on "the impact" or "effects" a challenged action had "on minority electoral opportunities," *id.* at 36 (quotation omitted), without considering whether those effects may have been the product of race-neutral redistricting goals. That focus may have been understandable before *Callais*, but it cannot survive the Supreme Court's holding that §2 simply guarantees minority voters "whatever opportunity results from the application of the State's combination of permissible criteria"—"nothing less and nothing more." *Callais*.Op.22.

**B.     The District Court's *Gingles* Analysis Conflicts With *Callais.***

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court "set out three threshold requirements for proving a §2 vote-dilution claim, plus a nonexhaustive list of factors to be considered in making a final decision as to whether the State had violated §2." *Callais*.Op.8. The *Callais* Court "update[d]" that framework to align it "with the statutory text and reflect[] important developments since [the Court] decided *Gingles* 40 years ago." *Callais*.Op.26.

Most of the district court's opinion consists of its application of the *Gingles* preconditions and the Senate factors. *See* DE274:36-221. In light of *Callais*, that analysis was fatally flawed.

**1. The district court's *Gingles* 1 holding conflicts with *Callais* because the court did not require Plaintiffs to draw maps race blind or meet "all" the State's legitimate redistricting objectives.**

"The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*.Op.29. While before *Callais* many §2 plaintiffs purported to meet this requirement by offering "illustrative maps with their desired number of majority-minority districts," *Callais* held that such maps "prove only that the State *could* create an additional majority-minority district, not that the State's failure to do so violated §2." *Id.* at 29. Thus, the Court clarified that (1) "in drawing illustrative maps, plaintiffs cannot use race" and that "an illustrative map in which race was used has no value in proving a §2 plaintiff's case," and (2) "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specific political goals." *Id.*

The district court violated both commands.

*First*, the district court thought that "Section Two itself demands consideration of race" because "the question whether additional majority-minority districts can be drawn … involves a quintessentially race-conscious calculus." Op.171 (alteration and quotation marks omitted). The district court thus considered the "use" of race in drawing an illustrative map permissible so long as "race did not predominate," Op.172—which, it said, occurs "'when race-neutral considerations [come]

9

into play only after the race-based decision had been made,'" *id.* (alteration in original and quotation omitted).

So the district court did not blink when Plaintiffs' expert Anthony Fairfax admitted that he used race when he drew Plaintiffs' illustrative maps:

> Mr. Fairfax testified that he *reviewed race at the beginning of the process* to see "where the minority community exists" but then "turn[ed] it off." *He acknowledged that he later checked the minority BVAP and BCVAP periodically* "to see if [he] me[]t th[e] sufficiently large component."
>
> Further, Mr. Fairfax testified that he "tend[s] to not consider race as much as the other [redistricting] criteria" and "always use[s] the other criteria labels more than race." Mr. Fairfax testified that when he prepared the illustrative plans he was not "toggling race and compactness" only, but "look[ed] at all of the criteria and trading off those," and he *considered race only to see "where the minority community exists."*

Op.173 (alterations in original, citations omitted, and emphasis added).

Despite these admissions, the district court concluded that "nothing in Mr. Fairfax's explanation of his map-drawing process causes the Court concern that he considered race-neutral criteria only after he made race-based decisions." Op.173-74. "Rather," the court found, "his testimony about his order of operations supports a finding that his map-making process was *race-aware to the degree the law allows.*" Op.174 (emphasis added).

Whether or not the district court was correct to find that Fairfax's use of race was permissible "to the degree the law" then allowed, *id.*, *Callais* makes clear that

10

"the degree the law allows" race to be used when drawing an illustrative map is none at all: "If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking—that illustrative map … has no value in proving a §2 plaintiff's case." *Callais*.Op.29 (citation omitted). The district court's holding to the contrary cannot survive *Callais*.

*Second*, the district court continued the "race predominant" theme when analyzing whether Fairfax considered the State's other districting objectives. While the *Callais* Court emphasized that an illustrative map "must meet all the State's legitimate districting objectives," *Callais*.Op.29, the district court held Plaintiffs to a lower standard. As it explained, Fairfax "testified that he followed five traditional redistricting criteria when drawing the plans," but merely "attempted" to follow "other criteria found in the Legislature's redistricting guidelines." Op.172-73. "'[T]here are always tradeoffs' when drawing a map," he explained, Op.173—meaning that he could not "achieve" "all the State's legitimate objectives" with his map, *Callais*.Op.29. Under *Callais*, that kind of map cannot "demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims." *Id.* Yet to the district court, Fairfax's map "established the first *Gingles* precondition." Op.176. That holding cannot be reconciled with *Callais*.

**2.** **The district court's *Gingles* II and III holdings conflict with *Callais* because the court did not require Plaintiffs to "disentangle" race and political affiliation.**

According to *Callais*, "[t]o satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that controls for party affiliation." *Callais*.Op.30. "In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Id.* As the Court explained, "simply pointing to *inter*-party racial polarization proves nothing, because 'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (quotation omitted). Section 2 plaintiffs must therefore "disentangle race and politics." *Id.* (cleaned up).

The district court applied the opposite rule: It said that "the second and third *Gingles* preconditions do not require that the Court disentangle party and race." Op.183. Again, regardless of what guidance may have existed at the time, the lower court's rule cannot be squared with *Callais*. Nor was application of its contrary rule harmless. While the Secretary offered expert testimony "that the voting patterns in Alabama are attributable to political party, not race," Op.73-74—and that "in general elections most black voters prefer Democratic candidates, and most white voters in both the challenged areas prefer Republicans," *id.* at 178 (alterations omitted)—the

district court waved away that analysis based on testimony from Plaintiffs' expert on polarized voting, Dr. Liu, *id.* at 73-74, 177. But as the district court noted, Dr. Liu did not even attempt to disentangle party and race: "he was not concerned with voters' motivations for selecting candidates, only whether the voting patterns were racially polarized." Op.74. Such testimony "proves nothing" under *Callais. Callais*.Op.30.

### 3. The district court's totality-of-the-circumstances holding conflicts with *Callais* because the court did not focus on evidence of "present-day intentional racial discrimination regarding voting."

The *Callais* Court also revised the "totality of the circumstances" inquiry, which formerly focused on the Senate factors derived from legislative history. This inquiry must now focus on "present-day intentional racial discrimination regarding voting." *Callais*.Op.30. "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* at 30-31.

The district court conducted a very different analysis. *See* Op.192-216. That analysis may be understandable (to some) given the caselaw at the time, but that it was very different and very wrong under the governing standards today is all that matters for the State's entitlement to relief. The court spent page after page detailing examples of Alabama's distant past, crediting trial testimony from Alabamians "who attended segregated public schools" many years ago, and opining that present-day

13

disparities in income and educational attainment "are inseparable from (and in large part the result of) the state's history of official discrimination." Op.206-16. That kind of analysis has a "remote bearing" on the question *Callais* asks: whether there exists "present-day intentional racial discrimination regarding voting." *Callais*.Op.30.

\* \* \*

*Callais* radically altered how §2 claims are to be assessed and made clear that intentional discrimination must be at the center of that analysis. The district court applied a very different "effects" test, and as a result came to a very different conclusion than the one *Callais* requires. Because the district court's holding cannot be squared with *Callais*, its injunctions must be vacated—or at least stayed.

## II.     The Equities Require Quick Relief.

The equities also favor granting the Secretary relief—and quickly.

*First*, without relief from this Court, the Secretary, the State of Alabama, and the Alabama public will all be irreparably harmed. *See Swain*, 958 F.3d at 1091 (noting that "where the government is the party opposing the … injunction, its interest and harm merge with the public interest"). If—as demonstrated above—the district court's injunctions cannot be reconciled with §2 "as property construed," *Callais*.Op.3, then not only does the injunction *prohibiting* Alabama from using its lawfully enacted map significantly harm the State's sovereign interests, but the injunction *requiring* the State to use a map intentionally drawn to include an additional

14

black-majority district imposes an unconstitutional racial gerrymander on both the State and the individual voters in the affected districts. *See Callais*.Op.35 ("In sum, because the Voting Rights Act did not require Louisiana to create an additional majority-minority district, no compelling interest justified the State's use of race in creating SB8. That map is an unconstitutional gerrymander, and its use would violate the plaintiffs' constitutional rights.").

*Second*, Plaintiffs will not be harmed by granting the Secretary relief because they will still receive "whatever opportunity results from the application of the State's combination of permissible criteria" in the creation of its Senate districts. *Callais*.Op.22. Under §2, Plaintiffs are "entitled to nothing less and nothing more." *Id.*

Yes, time is tight, even if this Court acts quickly. But the point of *Callais* is that elected officials—not courts—shoulder the burden of making most of the hard decisions concerning elections. This is one of them. It remains to be seen what the Alabama Legislature will do during its special session *this week* as it "consider[s] legislation to provide for a special primary election" for the districts affected by the district court's injunctions.[5] But that is all the more reason for this Court to act with haste and quickly return the opportunity to conducts elections in accordance with state law back to Alabama and her elected representatives.

---

[5] Proclamation, *supra* note 4.

## CONCLUSION

For these reasons, the Court should (1) vacate the injunctions (DE274 & 322) and immediately issue its mandate or (2) stay the injunctions.

Michael P. Taunton
Riley Kate Lancaster
BALCH & BINGHAM LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama 35203
Telephone (205) 251-8100
MTaunton@Balch.com

Respectfully submitted,

Steve Marshall
 *Alabama Attorney General*

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Solicitor General*

Robert M. Overing
*Principal Deputy Solicitor General*

James W. Davis
*Deputy Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36104
Telephone: (334) 242-7300
Fax: (334) 353-8400
Barrett.Bowdre@AlabamaAG.gov

*Counsel for Secretary of State Wes Allen*

MAY 4, 2026

## CERTIFICATE OF COMPLIANCE

1.      I certify that this motion complies with the type-volume limitations in Rule 27(d)(2)(A). It contains 4,223 words, including all headings, footnotes, and quotations (including in the appendix), and excluding the parts of the motion exempted under Rule 32(f).

2.      In addition, this motion complies with the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Secretary of State Wes Allen*

**CERTIFICATE OF SERVICE**

I certify that on May 4, 2026, I electronically filed this document using the Court's CM/ECF system, which will serve counsel of record.

s/ A. Barrett Bowdre
A. Barrett Bowdre
*Counsel for Secretary of State Wes Allen*

# APPENDIX

| District Court | *Callais* Court |
|---|---|
| *Gingles* **I: Numerosity and Compactness** ||
| ***SECTION 2 DEMANDS CONSIDERATION OF RACE***<br><br>"Because **the Voting Rights Act in itself *demands* consideration of race**, map drawers in Section Two cases will be aware of racial demographics[.]… [W]hether additional majority-minority districts can be drawn, after all, involves a quintessentially race-conscious calculus.… While **race consciousness is permissible**, race may not be the predominant factor in drawing district lines unless there is a compelling reason." Op.30-31 (citations and quotation marks omitted) (cleaned up) (emphases added). | ***RACE CANNOT BE CONSIDERED***<br><br>"First, in drawing illustrative maps, **plaintiffs cannot use race as a criterion**. If a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking—that illustrative map sheds no light on whether the State acted unconstitutionally by *not* adopting such a map. Thus, **an illustrative map in which race was used has no value in proving a §2 plaintiff's case**." *Callais*.Op.29 (citation omitted) (emphases added). |
| ***THERE WILL BE TRADE-OFFS BETWEEN DISTRICTING OBJECTIVES***<br><br>"To determine whether the plaintiffs satisfy this requirement, the Court compares the [Enacted] Plan with each illustrative plan provided by the plaintiffs. Further comparisons are not required; a Section Two district that is reasonably compact and regular, taking into account traditional districting principles, need not also defeat a rival compact district in a beauty contest." Op.32 (citations and quotation marks omitted) (cleaned up).<br><br>"[The] *Gingles* preconditions do not require that the Court disentangle party and race." Op.183. | ***ALL LEGITIMATE DISTRICTING OBJECTIVES MUST BE MET***<br><br>"Second, illustrative maps **must meet all the State's legitimate districting objectives**, including traditional districting criteria and the State's specified political goals. If the State's aims in drawing a map include a target partisan distribution of voters, a specific margin of victory for certain incumbents, … the plaintiffs' illustrative maps must achieve these goals just as well. If not, the plaintiffs would fail to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims. Only by meeting all the State's legitimate objectives can the illustrative maps help to 'disentangle race' from politics and other constitutionally permissible considerations." *Callais*.Op.29-30 (emphasis added). |

| District Court | *Callais* Court |
|---|---|
| *Gingles* II & III – Racially Polarized Voting | |
| ***RACE AND POLITICS DO NOT NEED TO BE DISENTANGLED***<br><br>"[T]he second and third *Gingles* preconditions **do not require that the Court disentangle party and race**." Op.183 (emphasis added).<br><br>"[A]cknowledging that race plays a key role in party attachments keeps the controlling legal standard honest and workable.… As the Court understands it, *Gingles* accounts for partisanship based on race in its demand for political cohesion among the minority group, which will be absent in times or places where party affiliations are driven primarily by something other than race." Op.201. | ***RACE AND POLITICS MUST BE DISENTANGLED***<br><br>"To satisfy the second and third preconditions—politically cohesive voting by the minority and racial-bloc voting by the majority—the plaintiffs must provide an analysis that **controls for party affiliation**. In other words, they must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation. This is, once again, **critical for disentangling race and politics**." *Callais*.Op.30 (quotation marks and citation omitted) (cleaned up) (emphases added). |
| **Totality of the Circumstances** | |
| ***PAST AND PRESENT DISCRIMINATION, AND SOCIO-ECONOMIC DISPARITIES, ARE GIVEN SUBSTANTIAL WEIGHT***<br><br>"[The totality of the circumstances] inquiry… requires … a searching practical evaluation of the past and present reality.… In this step, the court considers the Senate Factors, which include: the *history* of voting-related discrimination in the State or political subdivision; [and] … the **extent to which minority group members bear the effects of *past* discrimination**…." Op.32-33 (citations and quotation marks omitted) (emphases added). | ***PAST DISCRIMINATION AND SOCIO-ECONOMIC DISPARITIES ARE GIVEN "MUCH LESS WEIGHT"***<br><br>"[T]he 'totality of circumstances' inquiry must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits: present-day intentional racial discrimination regarding voting. **Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing effects of societal discrimination, are entitled to much less weight**. Far more germane are current data and current political conditions that shed light on current intentional discrimination. In large part *because of* the Voting Rights Act, our Nation has made great strides in eliminating racial discrimination in voting. And if, as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day voting discrimination, that is cause for celebration. *Callais*.Op.30-31 (cleaned up and emphasis added). |