Nos. 25-13007, 25-14131

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ALABAMA STATE CONFERENCE OF THE NAACP, *et al.*,

*Plaintiffs-Appellees*,

v.

SECRETARY OF STATE FOR THE STATE OF ALABAMA,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Alabama
Case No. 2:21-cv-01531-AMM

# BRIEF OF PLAINTIFFS-APPELLEES
## ALABAMA STATE CONFERENCE OF THE NAACP, GREATER BIRMINGHAM MINISTRIES, EVAN MILLIGAN

Deuel Ross
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th St. N.W. Ste. 600
Washington, DC 20005

Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
Colin Burke
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St., 5th Fl.,
New York, NY 10006

Alison Mollman
AMERICAN CIVIL LIBERTIES UNION
OF ALABAMA
P.O. Box 6179, Montgomery, AL 36106

David Dunn
HOGAN LOVELLS LLP
390 Madison Avenue,
New York, NY 10017

Davin M. Rosborough
Dayton Campbell-Harris
Theresa J. Lee
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., New York, NY 10004

Jacob van Leer
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005

Bradley E. Heard
Jack Genberg
SOUTHERN POVERTY LAW CENTER
1101 17th Street NW, Suite 550
Washington, DC 20036

Jessica L. Ellsworth
Jo-Ann Tamila Sagar
Amanda NeCole Allen
HOGAN LOVELLS LLP
555 Thirteenth Street, NW
Washington, DC 20004

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1–1 through 26.1–5, the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.   ACLU of Alabama

2.   Aden, Leah C.

3.   Alabama Attorney General's Office

4.   Alabama State Conference of the NAACP

5.   Allen, Amanda N.

6.   Allen, Hon. Wes

7.   American Civil Liberties Union Foundation

8.   Ashton, Anthony

9.   Balch & Bingham LLP

10.  Barnes, Anna-Kathryn

11.  Bowdre, A. Barrett

12.  Burke, Colin

13.  Burrell, Ashley

14.  Campbell-Harris, Dayton

15.  Carter, Brittany

16.  Chandler, Laquisha

17. Davis, James W.

18. Douglas, Scott

19. Duggan, Matthew R.

20. Dunn, David

21. Ebenstein, Julie A.

22. Ellsworth, Jessica L.

23. Ettinger, James W.

24. Faulks, LaTisha Gotell

25. Gbe, Harmony R.

26. Geiger, Soren A.

27. Genberg, Jack

28. Greater Birmingham Ministries

29. Harris, A. Reid

30. Hattix, Laurel Ann

31. Heard, Bradley E.

32. Hogan Lovells US LLP

33. Jackson, Sidney

34. LaCour Jr., Hon. Edmund G.

35. Lakin, Sophia Lin

36. Lancaster, Riley Kate

37. Lawsen, Nicki

38. Lee, Theresa J.

39. Livingston, Sen. Steve

40. Manasco, Hon. Anna M.

41. Marshall, Hon. Steve

42. Mauldin, Dylan L.

43. Maze, Hon. Corey L.

44. McClendon, (former) Sen. Jim

45. McKay, Charles A.

46. Merrill, Hon. John H.

47. Messick, Misty S. Fairbanks

48. Milligan, Evan

49. Mink, Richard D.

50. Mollman, Alison

51. NAACP Legal Defense and Educational Fund, Inc.

52. Naifeh, Stuart

53. National Association for the Advancement of Colored People

54. Newsom, Hon. Kevin C.

55. Olofin, Victor

56. Overing, Robert M.

57.    Pringle, Rep. Chris

58.    Rand, Paul

59.    Rosborough, Davin

60.    Ross, Deuel

61.    Sadasivan, Kathryn

62.    Sagar, Jo-Ann

63.    Seiss, Benjamin M.

64.    Shapiro, Avner

65.    Short, Caren E.

66.    Simelton, Benard

67.    Smith, Brenton M.

68.    Southern Poverty Law Center

69.    Stewart, Shelita M.

70.    Stone, Khadidah

71.    Taunton, Michael P.

72.    Thomas, James

73.    Thompson, Blayne R.

74.    Turrill, Michael

75.    Unger, Jess

76.    van Leer, Jacob

77.     Walker, J. Dorman

78.     Wallace, Janette McCarthy

79.     Weisberg, Liza

80.     Welborn, Kaitlin

81.     Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC

82.     Wilson, Thomas A.

83.     Woodard, J. Scott

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

Respectfully submitted this 26th day of May 2026.

/s/ Davin Rosborough
*Counsel for Plaintiffs-Appellees*

**STATEMENT REGARDING ORAL ARGUMENT**

Because of the exceptional importance of this case to Black Alabamians in the Montgomery area seeking an equal opportunity to elect candidates of choice, and to the development of the law concerning Section 2 of the Voting Rights Act after *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), Plaintiffs respectfully request oral argument.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF THE ISSUES....................................................................6

STATEMENT OF THE CASE.........................................................................6

    A. The Reapportionment Committee Adopts Redistricting Guidelines and the 2021 Legislature Approves a New State Senate Map. ..................6

    B. Plaintiffs File this Action, which Proceeds to Trial on Plaintiffs' Voting Rights Act Claims. ..........................................................................8

    C. The District Court Finds that Alabama's State Senate Districts in Montgomery Violate Section 2 of the Voting Rights Act but Rejects Plaintiffs' Claim in Huntsville. ...................................................................9

    D. The Legislature Declines to Draw a Map, so the Court Adopts a Race-Blind Map that Creates a New Competitive District. .....................13

    E. Alabama Implements the Remedial Map and Voters Select Candidates Under the Remedial Map in Primaries on May 19................14

STANDARD OF REVIEW ............................................................................15

SUMMARY OF ARGUMENT .......................................................................16

ARGUMENT ....................................................................................................19

    I. Plaintiffs' Illustrative Plan Satisfies the First Precondition under *Callais*…..................................................................................................19

    II. Plaintiffs Satisfy *Gingles* 2 and 3 by Disentangling Racial and Political Affiliation in Voting Patterns. ...................................................31

    III. Based on Recent Evidence of Intentional Discrimination in Voting and Current Conditions in Alabama, Plaintiffs Satisfy the Totality of Circumstances Test Updated by *Callais*....................................................37

IV. If the Court Chooses Not to Affirm and Believes the District Court Needs to Evaluate the Record in Light of *Callais* in the First Instance, it Should Remand Without Vacatur. ...........................................................44

CONCLUSION ................................................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Alabama Legislative Black Caucus v. Alabama*,
231 F. Supp. 3d 1026 (M.D. Ala. 2017) ................................................................39

*Alabama Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015) .............................................................................................48

*Alabama Legislative Black Caucus v. Alabama*,
989 F. Supp. 2d 1227 (M.D. 2013) .......................................................................43

*Alabama State Conference of the NAACP v. City of Pleasant Grove*,
No. 18-cv-02056, 2019 WL 517237 (N.D. Ala. Oct. 11, 2019) .........................39

*Alexander v. South Carolina State Conference of NAACP*,
602 U.S. 1 (2024) ........................................................................... passim

*Allen v. Caster*,
No. 25-273 (U.S. May 11, 2026) ..........................................................................45

*Allen v. Milligan*,
599 U.S. 1 (2023) ........................................................................... passim

*Alpha Phi Alpha Fraternity, Inc. v. Secretary, State of Georgia*,
No. 23-13914 (11th Cir. May 8, 2026) .................................................................45

*Bartlett v. Strickland*,
556 U.S. 1 (2009) .............................................................................. 3, 21

*Baylor v. Jefferson County Board of Education*,
733 F.2d 1527 (11th Cir. 1984) ............................................................................16

*Bethune-Hill v. Virginia State Board of Elections*,
580 U.S. 178 (2017) ..............................................................................................28

*Black Warrior Riverkeeper v. U.S. Army Corps of Engineers*,
781 F.3d 1271 (11th Cir. 2015) ............................................................................47

*Brown v. Alabama Department of Transportation,*
597 F.3d 1160 (11th Cir. 2010) ...............................................................40

*Bryant v. Jones*,
575 F.3d 1281 (11th Cir. 2009) ...............................................................29

*Bui v. Haley,*
321 F. 3d 1304 (11th Cir. 2003) ..............................................................41

*Cooper v. Harris,*
581 U.S. 285 (2017)..................................................................................15

*Davis v. Coca-Cola Bottling Co. Consolidated,*
516 F.3d 955 (11th Cir. 2008) ...................................................................6

*Dillard v. City of Greensboro,*
74 F.3d 230 (11th Cir. 1996) ...................................................................48

*Frank v. Walker*,
574 U.S. 929 (2014)..................................................................................47

*Gingles v. Thornburg,*
478 U.S. 30 (1986)...................................................................... 15, 32, 35

*Godby v. Montgomery County Board of Education,*
996 F. Supp. 1390 (M.D. Ala. 1998).......................................................41

*In re Blue Cross Blue Shield Antitrust Litigation MDL 2406,*
85 F.4th 1070 (11th Cir. 2023) ...................................................................6

*Johnson v. Hamrick,*
296 F.3d 1065 (11th Cir. 2002) ......................................................... 15, 16

*Jones v. Jefferson County Board of Education,*
No. 19-CV-01821, 2019 WL 7500528 (N.D. Ala. Dec. 16, 2019) ....................39

*Louisiana v. Callais*,
146 S. Ct. 1131 (2026)....................................................................... passim

*McCrory v. Harris,*
577 U.S. 1129 (2016)................................................................................47

*Mobile v. Bolden*,
  446 U.S. 55 (1980)................................................................47

*Moore v. Brown*,
  448 U.S. 1335 (1980)............................................................48

*Moore v. Harper*,
  142 S. Ct. 1089 (2022)..........................................................47

*North Carolina v. Covington*,
  583 U.S. 1109 (2018)............................................................47

*Owens v. Wainwright*,
  698 F.2d 1111 (11th Cir. 1983) ...........................................37

*Robinson v. Ardoin*,
  605 F. Supp. 3d 759 (M.D. La. 2022)..................................38

*Shelby County v. Holder*,
  570 U.S. 529 (2013)..............................................................40

*Stout ex rel. Stout v. Jefferson County Board of Education*,
  882 F.3d 988 (11th Cir. 2018) .............................................40

*Thomas v. Attorney General of Florida.*,
  795 F.3d 1286 (11th Cir. 2015) ...........................................48

*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*,
  513 U.S. 18 (1994)................................................................46

*United States v. Montgomery*,
  948 F. Supp. 1553 (M.D. Ala. 1996)...................................41

*United States v. M.C.C. of Florida, Inc.*,
  967 F.2d 1559 (11th Cir. 1992) ...........................................45

*United States v. Marengo County Commission*,
  731 F. 2d 1546 (11th Cir. 1984) ..........................................40

*United States v. McGregor*,
  824 F. Supp. 2d 1339 (M.D. Ala. 2011).............................39

*Weatherly v. Alabama State University*,
    728 F.3d 1263 (11th Cir. 2013) ............................................................40

*Wright v. Sumter County Board of Elections & Registration*,
    979 F.3d 1282 (11th Cir. 2020) ...........................................................15

**Statutes**

28 U.S.C. § 2106 ....................................................................................46

52 U.S.C. § 10301 ..................................................................................32

**Other Authorities**

Administrative Calendar, 2026 Statewide Election, Alabama Secretary of
    State
    https://www.sos.alabama.gov/sites/default/files/election-
    2026/AdminCalendar%20-2026.pdf.....................................................15

Unofficial Election Night Results: 2026 Primary Election Statewide Results,
    Alabama Secretary of State,
    https://www2.alabamavotes.gov/electionNight/statewideResultsByContes
    t.aspx?ecode=1001290........................................................................15

# INTRODUCTION

After an eight-day trial with over twenty witnesses (including ten experts), the district court issued a 261-page opinion finding that "Black voters have less opportunity than other Alabamians" in the Montgomery area "to elect candidates of their choice to the Alabama Senate." Op.216.[1] The evidence supported that decision in 2025, and it continues to support it today, after *Louisiana v. Callais*, 146 S. Ct. 1131 (2026). In *Callais*, the Supreme Court decided not to "abandon[] . . . the *Gingles* framework," rather it "only update[d]" it. *Id.* at 1157. The record contains, and the district court relied on, overwhelming evidence that meets even the four modifications of the Section 2 standard made in *Callais*.

*First*, *Callais* instructed that to meet the first *Gingles* precondition, plaintiffs must show, as before, "that a community of minority voters" is "sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 146 S. Ct. at 1159. But in making that showing: (a) plaintiffs must "not use race as a districting criterion," meaning that although a mapmaker can reference racial data after drawing a map, it may not be used in an unconstitutional manner in the actual drawing process, *id.*; and (b) plaintiffs "must meet all the State's legitimate districting objectives, including traditional districting criteria and the

---

[1] "Op." refers to the district court's decision in this case, available at Doc. 274 on the district court docket. Citations to "Doc." refer to the district court docket as well, and citations to "11thCirDoc." refer to this Court's docket in Case No. 25-13007.

State's specified political goals," to the extent permitted by the Constitution, *id*. Here, the district court found, and the Secretary did not contest, that Plaintiffs' illustrative plan complied with Alabama's traditional districting principles. *See* Op.165–71.

"The Secretary's sole argument about the configuration of Proposed District 25 [was] that the illustrative district is not reasonably configured because it 'subordinates traditional districting principles to racial considerations.'" Op.166. That is, he never contested that Mr. Fairfax's plan satisfied every other state redistricting guideline. *Id*.; *see also* Op.98, 153 (noting that Alabama's expert "did not analyze the compactness of Proposed District 25," or "whether [Plaintiffs'] plan respects political subdivisions, observes natural boundaries, preserves the cores of districts, or pairs incumbents"). Indeed, the Secretary never asserted—and the record contains no evidence of—any partisan goals or the State's attempt to prioritize any particular community in Montgomery. The only potential "political" goal raised in the State's guidelines is the lower-tier goal of not pairing incumbents—but Plaintiffs' illustrative map accomplished that goal in the relevant region.

In terms of the use of race, the district court properly found that the record did not contain "any evidence, let alone sufficient evidence, that race predominated in the preparation of Proposed District 25." Op.171. Rather, consistent with *Callais*,

the court found that Plaintiffs' map-drawer did not use race as a districting criterion in the drawing process or even have that data turned on while drawing. Op.168. The court recognized that Plaintiffs' map-drawer only referred to racial demographic information before or after the fact to understand whether the map met the numerosity threshold requirement established in *Bartlett v. Strickland*, 556 U.S. 1 (2009). Op.173. That is, Plaintiffs' expert was aware of the racial makeup of the area in a manner similar to Alabama's own map-drawer, Op.93, and did not transgress the limited leeway related to race in redistricting that the Supreme Court found permissible for South Carolina's map-drawers in *Alexander v. South Carolina State Conference of NAACP*, 602 U.S. 1, 22, 37 (2024).

*Second*, Plaintiffs must show "politically cohesive voting by the minority and racial-bloc voting by the majority," but in doing so, also "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159. To satisfy this standard, plaintiffs can show evidence of "intra-party" racial polarization. *Id*. at 1158. Here, the court found *both* "an overwhelming preponderance of the evidence" that the White majority usually prevents Black voters from electing preferred candidates, Op.174, *and* that these voting patterns could not be understood "as mere party politics," Op.196. Rather, the Court found that "race is a driving factor in Black Alabamians' . . . voting patterns," Op.194, and that the record cannot reconcile the proposition "that White voters are willing

3

to support minority candidates in large numbers with political reality," Op.192. As a result, "the reality [is] that Black Alabamians enjoy zero success in statewide elections, and near-zero success in legislative elections outside of Black-opportunity districts protected by federal law." Op.198.

As *Callais* requires, 146 S. Ct. at 1157–58, Plaintiffs presented evidence from primary and nonpartisan elections as well as other testimony and analysis that showed racial polarization even after controlling for partisanship. *See, e.g.*, Op.74, 188–197, 199. The court found that that the testimony of the Secretary's expert (Dr. M.V. Hood) did "not match reality in Alabama," and was undermined by his own scholarship, that, for example, "race was and is a driving force behind party politics" in Alabama and the region. Op.181–83. The court similarly found that the evidence presented by another expert for the Secretary (Dr. Chris Bonneau) was "limited and [that] the Secretary's arguments from it overdrawn." Op.189. Indeed, after fixing an error, Dr. Bonneau's own analysis showed "greater success (as defined by vote share) for White Democrats than Black Democrats." Op.123.

*Third*, the district court found that current conditions are such that "official discrimination on the basis of race . . . continues to affect Black Alabamians' lives and political participation today." Op.200. The court was "keenly aware of the instruction that 'past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" Op.199 (citation omitted). For that

4

reason, rather than looking to distant history, the court cited substantial evidence that "official discrimination in voting rights in Alabama . . . . has run well into the present era," with several relevant court decisions "issued in the last ten years." Op.204. This evidence provided the necessary inferences of racial discrimination to accompany the Court's finding that "Enacted Plan unlawfully diluted Black votes by packing Black voters into District 26." Injunction, Order, & Court-Ordered Remedial Map, Doc.322 at 17.

The court's analysis did not run into any of the pitfalls identified in *Callais*. The district court did "not assign Alabama's shameful history dispositive weight," and the court "[did] not grant Section Two relief simply because it condemns past discrimination." Op.199–200. Nor did the court "grant Section Two relief simply because of socioeconomic disparities across races." Op.211. It considered the testimony of the Secretary's expert, Dr. Wilfred Reilly, but gave "very little weight" to his opinions because they were not focused on Alabama and largely unsupported by facts, and his testimony was "dogmatic, defensive, and deliberately confrontational." Op.184–85. The court "[did] not find Dr. Reilly's methods or conclusions reliable or helpful." Op.186.

Additionally, although the Secretary separately appealed the district court's remedial order, *see* Notice of Appeal, No. 25-14131, Doc.1-2 (11th Cir. Dec. 1, 2025), the Secretary has now abandoned any arguments against the remedial order

by failing to raise them in his opening brief, *see* 11thCir.Doc.74. "If a party makes only passing references to an issue in its statement of the case or its summary of the argument in the opening brief, the issue is considered abandoned." *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1092 (11th Cir. 2023); *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 (11th Cir. 2008) ("It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned.").

The court's findings and the underlying record meet all the updated criteria that the Supreme Court required in *Callais*, revealing that Alabama's State Senate map in the Montgomery area denied Black voters an equal opportunity to participate in the political process and elect candidates of their choice.

## STATEMENT OF THE ISSUES

Whether the district court clearly erred in finding the Secretary liable under Section 2 of the Voting Rights Act for racial vote dilution in Alabama's State Senate map in the Montgomery area, viewed considering the Supreme Court's decision in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026).

## STATEMENT OF THE CASE

**A.     The Reapportionment Committee Adopts Redistricting Guidelines and the 2021 Legislature Approves a New State Senate Map.**

The process for drawing the State Senate map in 2021 under 2020 Census data began with the adoption of Alabama's Redistricting Guidelines (the "Guidelines")

by the Permanent Legislative Committee on Reapportionment (the "Committee"). Op.13. The Guidelines "prioritized population equality, contiguity, compactness, and avoiding dilution of minority voting strength," and "encouraged, as a secondary matter, avoiding incumbent pairings, respecting communities of interest, minimizing the number of counties in each district, and preserving cores of existing districts." Op.13. This process was overseen by Committee Chair Senator Jim McClendon, Op.92, who delegated the map-drawing to longtime Committee cartographer Randy Hinaman, Op.16.

McClendon and Hinaman relied on the Guidelines in the map-creation process. Op.94–95; McClendon Dep., Doc.235-1 at 22. They began with previous map. Op.16. Other than complying with the Guidelines, Senator McClendon did not instruct Hinaman about any "particular priorities" for the map and gave him "very little" guidance when he started the process. Doc.235-1 at 24. McClendon also confirmed that the 2021 State Senate map was drawn without looking at party affiliation data. Doc.235-1 at 28.

Mr. Hinaman was not given any instructions to keep communities of interest together, and he did not try to keep any together. Hinaman Dep., Doc. 235-2 at 75. Similarly, Senator McClendon could not recall specific discussions of specific communities in any meeting he attended with Mr. Hinaman and other Senators. Doc.235-1 at 85. In terms of the districts in the Montgomery area, the Plan placed

7

"all majority-Black precincts except two into the majority-Black District 26," and created District 25, which "extend[ed] into the center of Montgomery to include two predominantly White precincts and a portion of a third." Op.94. Mr. Hinaman testified that he did not view racial statistics while drawing the map but did so afterwards to ensure compliance with the Voting Rights Act. Op.92–93.

Governor Ivey called a Special Session for redistricting in October 2021, in which McClendon and Hinaman's State Senate Plan was first presented to the Committee. Op.17. The Committee passed the plan, "although all Black members of the Committee voted against it." Op.17. The Legislature passed the Plan that same week and "Governor Ivey signed it into law on November 4, 2021." Op.17.

**B.      Plaintiffs File this Action, which Proceeds to Trial on Plaintiffs' Voting Rights Act Claims.**

Plaintiffs filed this action on November 16, 2021, originally bringing both constitutional and Voting Rights Act claims. Op.4. Shortly after filing, though, in March 2022, the Court stayed the case "pending a ruling by the Supreme Court of the United States in *Milligan v. Merrill*." Order, Doc.61. That stay was lifted in June 2023. Order, Doc.75. Several months later, Plaintiffs amended and filed their operative complaint, bringing only claims under Section 2 of the VRA concerning the State Senate map in Montgomery and Huntsville. Doc.126. The Court denied Defendants' motions to dismiss, Doc.143, and, after discovery, denied Defendants' motion for partial summary judgment, Doc.191.

Trial was held over eight days in November 2024. The Court heard "live testimony from twenty witnesses (including ten experts), designated deposition testimony from three lay witnesses" including Senator McClendon and Mr. Hinaman, "joint stipulations of fact that span twenty-seven pages, [and] proposed findings of fact and conclusions of law that span more than 400 pages." Op.iii.

**C.** **The District Court Finds that Alabama's State Senate Districts in Montgomery Violate Section 2 of the Voting Rights Act but Rejects Plaintiffs' Claim in Huntsville.**

On August 22, 2025, the district court issued an over-250-page opinion finding that "plaintiffs have failed to establish a Section Two violation in the Huntsville area, and they have established a Section Two violation in the Montgomery area." Op.iii. The court rejected Plaintiffs' Huntsville-area claim under the first *Gingles* precondition. *Id*. Plaintiffs did not appeal that decision.

On the Montgomery-area claim, the court first found that Plaintiffs met the first *Gingles* precondition because their illustrative map largely adhered to county boundary lines and reduced a county split, had better compactness scores for the new District 25, and made the town of Pike Road whole. Op.165–67. In doing so, it found Plaintiffs' map-drawer Mr. Anthony Fairfax was "credible," "reliable[,] and helpful." Op.152. The court explained that the "sole argument" the Secretary lodged against Plaintiffs' map in Montgomery was on racial predominance grounds. Op.166. But the court rejected those arguments, finding that there was no record

9

evidence "that race predominated in the preparation of Proposed District 25." Op.170–71.

As to evidence regarding racial polarization (*Gingles* 2 and 3 and Senate Factors 2 and 7), the court also found that Plaintiffs met their burden. It found the opinions of Plaintiffs' racial-polarization expert, Dr. Baodong Liu, "credible, reliable, and helpful," and that "[n]one of the Secretary's experts conducted a racial polarization analysis." Op.172. The district court emphasized "the clarity and extremity of the pattern of racially polarized voting" detailed in the case, Op.173, and that "[o]utside of Black-opportunity districts, Black Alabamians have nearly zero opportunity to elect candidates of their choice," Op.174.

As to evidence concerning whether racially polarized voting was merely a reflection of partisan politics or instead showed that Black voters have less opportunities to elect candidates of choice because of their race, the district court found the latter. Op.187–98. The court cited evidence from primaries, nonpartisan elections, expert and lay witness testimony, *see id.*, rejecting Alabama's position that "White voters are willing to support minority candidates in large numbers with political reality." Op.192. The court did not "understand the [voting] patterns it sees as mere party politics," Op.196, and found that the "racial cleavages in voting patterns in Alabama" are best described as "racially polarized voting" rather than voting polarized by politics that incidentally drives racial polarization, Op.196–97.

The court also rejected the credibility of the Secretary's experts who tried to undermine this showing. The court did not credit the testimony of Dr. Hood "about the impact of party and race on voting patterns in Alabama because (1) his findings improperly draw broad conclusions from very limited, atypical data, and (2) the court cannot reconcile this testimony with the reality of election results in the state as stipulated by the parties." Op.182. As for the testimony of Dr. Adam Carrington, the court assigned it "no weight," in part because he evinced "very limited familiarity with Alabama history and politics" and a "lack of relevant expertise," along with general "carelessness." Op.186–87. The district court did credit the testimony of the Secretary's expert Dr. Chris Bonneau, Op.184, but found his "evidence limited and the Secretary's arguments from it overdrawn." Op.189.

As to evidence under the totality-of-circumstances inquiry, the court remarked that it "does not assign Alabama's shameful history dispositive weight" or "grant Section Two relief simply because it condemns past discrimination." Op.199–200. Rather, the court had before it an "extensive record about both past and present discrimination, and a wealth of expert analysis of recent data about Black Alabamians' lives and voting patterns, along with other evidence." Op.200. All that evidence told "the same story: official discrimination on the basis of race has affected Black Alabamians' lives and political participation for a long time, and it continues to affect Black Alabamians' lives and political participation today."

Op.200. In particular, the district court cited stipulations concerning multiple recent "instances of official discrimination" regarding voting, Op.200, as well as multiple other examples of recent intentional racial discrimination in voting attributable to the Alabama Legislature, Op.202–03, including an effort in 2010 by Alabama State Legislators who "conspired to depress Black voter turnout by keeping a referendum issue popular among Black voters (whom the Senators called "Aborigines") off the ballot." Op.203–04.

The court also credited expert testimony from Plaintiffs' experts Dr. Jospeh Bagley and Dr. Traci Burch. Op.180–81. This evidence included testimony about continuing discrimination in "segregated public schools and dilapidated schools in predominantly-Black areas," which leads to "lower educational attainment," and in turn "hinder[s] Black Alabamians' opportunity to participate in the political process," Op.208. By contrast, the court gave the opinions of the Secretary's expert Dr. Wilfred Reilly "very little weight" because his testimony did not focus on Alabama, was repeatedly offered "without support," and was presented with the goal of being "evocative rather than reliable." Op.184–85. For example, portions of Dr. Reilly's report "cited only websites (Wikipedia, Quora, and Reddit) with no scholarship or peer-reviewed backup." Op.190. Thus, the court did "not find Dr. Reilly's methods or conclusions reliable or helpful," Op.186.

Based on this evidence as to the Montgomery area, the court found that Plaintiffs had "established every element of a violation of Section Two in the Montgomery area," and that the evidence showed that "Black voters have less opportunity than other Alabamians to elect candidates of their choice to the Alabama Senate." Op.216.

**D. The Legislature Declines to Draw a Map, so the Court Adopts a Race-Blind Map that Creates a New Competitive District.**

Shortly after issuing its liability decision on August 22, 2025, the court requested that the Parties file a Joint Status Report with their positions regarding the remedial process, which they did on August 27, 2025. Doc.275. The Secretary was unsure if the Legislature wished to meet to draw its own map. Doc.275 at 4. But he explained that, due to factors like counties being "required to reassign" voters to new districts, he "believe[d] that a remedial map for the [May 19,] 2026 election would need to be in place on or before November 17, 2025 to mitigate these concerns." *Id*.

On September 26, 2025, the Secretary informed the court that the Legislature did not intend to draw its own remedial map. Status Report, Doc.299. Two days later, the Secretary filed a motion for a stay of remedial proceedings, Doc.278, which the court denied, Doc.302. In the same order, the court appointed a special master and set a schedule for remedial proceedings. *Id*. at 8, 10–15.

The Special Master presented three maps to the court. Doc.312 at 10–13. On November 17, 2025, the court adopted Special Master Plan 3, a plan drawn by a

college student without any reference to race, which only altered two districts (25 and 26), and in which Black-preferred candidates would win in the remedial district under 50% of the time. Doc.322 at 21–23, 25. The court also considered another plan drawn without looking at race that met or beat the enacted plan on compactness, county splits, and other criteria, with two districts with around 50% BVAP. Doc.312 at 19–25.

### E. Alabama Implements the Remedial Map and Voters Select Candidates Under the Remedial Map in Primaries on May 19.

With this Remedial Plan in place, the Secretary, local election, officials, candidates and voters began preparing for and participating in the 2026 elections. The candidate filing deadline for major parties occurred on January 23, 2026, the Secretary certified names of opposed primary candidates on March 6, election officials received absentee ballots on March 25, ballots were mailed to qualified military and overseas voters by April 4, absentee ballots were returned by mail had to be received by May 12, and by hand by May 18.[2] Voters selected candidates in all contested State Senate primaries, including the Democratic primary in remedial Senate District 26 where three candidates competed under the court-ordered plan.[3]

---

[2] *See* Admin. Calendar, 2026 Statewide Election, Ala. Sec'y of State (last visited May 21, 2026) https://www.sos.alabama.gov/sites/default/files/election-2026/AdminCalendar%20-2026.pdf [https://perma.cc/Q5NT-EFST].

[3] *See* Unofficial Election Night Results: 2026 Primary Election Statewide Results, Ala. Sec'y of State (last visited May 24, 2026),

**STANDARD OF REVIEW**

This Court's review of "a district court's finding of vote dilution under section 2 is only for clear error." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 979 F.3d 1282, 1301 (11th Cir. 2020) (citing *Gingles v. Thornburg*, 478 U.S. 30, 79 (1986)). "This standard does not allow [the Court] to reverse the finding of the trier of fact simply because [it is] convinced [it] would have decided the case differently." *Id*. (citation modified). Rather, this Court must "give due regard to the opportunity of the trial court to judge the credibility of witnesses." *Id*. (citation modified). Credibility determinations are entitled to "singular deference." *Cooper v. Harris*, 581 U.S. 285, 309 (2017).

The Court must affirm unless it concludes "the district court's findings are not supported by substantial evidence." *Wright*, 979 F. 3d at 1301 (quoting *Johnson v. Hamrick*, 296 F.3d 1065, 1074 (11th Cir. 2002)). The clearly erroneous standard "preserves the benefit of the trial court's particular familiarity with the indigenous political reality of the state . . . under review," and its "special vantage point and ability to conduct an intensely local appraisal of the design and impact of a voting system." *Hamrick*, 296 F.3d at 1074 (citation modified).

---

https://www2.alabamavotes.gov/electionNight/statewideResultsByContest.aspx?ecode=1001290 [https://perma.cc/FFF6-VGL6].

It is also "well settled that a successful party in the district court may urge any grounds supported by the record for affirmance [regardless] of whether the district court specifically recited those grounds in its decision." *Baylor v. Jefferson Cnty. Bd. of Educ.*, 733 F.2d 1527, 1534 (11th Cir. 1984).

## SUMMARY OF ARGUMENT

*Callais* made meaningful updates to the longstanding *Gingles* test, but Plaintiffs amassed and the Court relied upon more-than sufficient evidence to meet this revised standard. This is not surprising. Throughout this case, the Secretary made arguments similar (or more extreme) to the ones adopted in *Callais*, so Plaintiffs assembled evidence to meet even those farther-reaching standards.

*First*, the Supreme Court in *Callais* made two updates to the first *Gingles* precondition, which requires that Plaintiffs demonstrate that Black voters are "sufficiently numerous and compact to constitute a majority in a reasonably configured district." 146 S. Ct. at 1159. Now, in making that showing, plaintiffs "cannot use race as a districting criterion" while drawing the illustrative map, though referencing racial data occasionally at other times is still permissible. *Id*. Indeed, nothing in *Callais* purports to overturn the rule that "in gerrymandering cases a challenger must show that race was the [cartographer's] predominant consideration." *Id*. at 1147. *Callais* also requires that a plaintiff's map "must meet all the State's legitimate districting objectives, including traditional districting criteria and the

16

State's specified political goals," to the extent permitted by the Constitution, *id*. at 1159.

The Secretary and his expert never contested that Plaintiffs' new illustrative district met the numerosity requirement, or that the map met or beat Alabama on all of its top-tier criteria, as the court found. Op.165–69. The new district was more compact than the existing one, and the map maintained equal population and contiguity, reduced the number of county splits, and unsplit the town of Pike Road, a community of interest highlighted by several of the Secretary's witnesses. *Id*. The record contained no evidence of partisan goals, and the Senator in charge of drawing the map denied any use of political data. Doc.235-1 at 28–29. And, although not pairing incumbents was a lower-tier goal, Plaintiffs did not pair incumbents in the Montgomery area.

As to racial data, Plaintiffs' map-drawer used it in much the same way as the State's map-drawer and as approved by the Supreme Court in *Alexander* (and reaffirmed in *Callais*): he did not view racial data while drawing the map, and only referenced racial statistics after he completed draft maps to determine whether the district was sufficiently compliant with *Bartlett* to submit to the court. Op.168–71. Indeed, the court found that the record did not contain "*any evidence*, let alone sufficient evidence, that race predominated in the preparation of Proposed District 25." Op.171 (emphasis added).

*Second*, the second and third *Gingles* preconditions have long required proof that Black voters are "politically cohesive," and that "the [W]hite majority votes sufficiently as a bloc to enable it . . . to defeat the [Black voters'] preferred candidate." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citation modified). *Callais* added on to that a requirement that Plaintiffs "must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation" with evidence of "intra-party racial-bloc voting" in primaries. 146 S. Ct. at 1159. Plaintiffs did just that, offering evidence from Democratic and Republican primaries, nonpartisan elections, and expert and fact witness testimony that led the court to conclude that "it [could not] understand the [voting] patterns it sees as mere party politics." Op.196.

*Third*, plaintiffs must "show, under the 'totality of circumstances,' that the political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18. *Callais* clarified that this analysis must focus more on "present-day intentional racial discrimination regarding voting," and give less weight to older discrimination, 146 S. Ct. at 1160, such that there is a "strong inference of racial discrimination," *id.* at 1162. The court's analysis did that, focusing on numerous instances of official discrimination in voting in Alabama since 2010, ranging from discriminatory districting schemes to a conspiracy by Alabama state legislators to depress Black turnout in which some are recorded using racial slurs. Op.200–05.

18

Moreover, the court relied on extensive expert and fact witness testimony to find that "official discrimination on the basis of race . . . continues to affect Black Alabamians' lives and political participation today." Op.200. This evidence supported the court's finding that the "Enacted Plan unlawfully diluted Black votes by packing Black voters into District 26," Doc.322 at 17, and provided the strong inference of discrimination sufficient to satisfy *Callais*.

Finally, if the Court is unsure whether the evidence is sufficient to affirm on the merits and it wishes the district court to examine the full record in the first instance, it should remand without vacatur. Alabama's primary has already occurred under the remedial map and there is no time to employ a new map this year. Vacating the injunction would leave Alabama without a functional map unless the Plaintiffs can secure emergency relief before the district court. Rather than set off such chaos, the Court should allow the district court to determine the appropriate course in the event it does not affirm.

## ARGUMENT

### I. Plaintiffs' Illustrative Plan Satisfies the First Precondition Under *Callais*.

"The first *Gingles* precondition is that a community of minority voters must be sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 146 S. Ct. at 1159. After a close analysis of the record,

19

the district court concluded that Plaintiffs "established the first *Gingles* precondition for their claim of vote dilution in the Montgomery area . . . ." Op.171.

*Callais* "update[d] the [*Gingles*] framework," 146 S. Ct. at 1157, in two ways as to the first precondition. First, it held that in drawing illustrative maps, plaintiffs "cannot use race as a districting criterion." *Id.* at 1159. In doing so, it limited the use of race to the same extent it "would be unconstitutional if a State engaged in such mapmaking." *Id.* (citing *Alexander*, 602 U.S. at 6). Second, it held that the "illustrative maps must meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specified political goals." *Id.* at 1159. Plaintiffs satisfy these updated conditions.

**A. Based on the Record, the District Court Correctly Found That It Is Possible to Draw an Additional Majority-Black District Without Impermissibly Using Race as a Criterion.**

This Court properly concluded that Plaintiffs' map drawing expert, Mr. Anthony Fairfax, did not use race as an improper criterion. Op.167–71. The Secretary's views otherwise rely on overstatements of *Callais*'s updates to the first *Gingles* precondition and distortions of the trial record.

In *Callais*, the Court clarified that the standard state actors must satisfy when drawing districts also applies to the illustrative plans of plaintiffs seeking to establish a Section 2 violation. 146 S. Ct. at 1159 (explaining that Section 2 plaintiffs may not use race in a manner "that would be unconstitutional if a State engaged in such

mapmaking"); *see id*. 1146–48. Specifically, "in drawing illustrative maps, plaintiffs cannot use race as a districting criterion." *Id*. at 1159. The standard is *not* that the map drawer must have no awareness of race or that he cannot consult racial statistics after an iteration of a map is drawn to select a version that satisfies the standard set in *Bartlett v. Strickland—i.e.*, that plaintiffs must "show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." 556 U.S. 1, 19–20 (2009) (plurality). As the three-judge court in *Milligan v. Allen* just explained in granting a preliminary injunction against Alabama's 2023 congressional map under the *Callais* standard, *Callais* forbids a particular use of race — namely, using "race as a districting criterion" "in **drawing** illustrative maps," but it does not mean that "a cartographer simply may not 'use race' at all." Order (*Milligan* 3rd PI) at 50–51, *Milligan v. Allen*, No. 2:21-cv-01530-AMM, Dkt. No. 537 (N.D. Ala. May 26, 2026)[4]. Rather, under "precedent that *Callais* does not disturb" and as Alabama "conceded at argument, a cartographer may consider 'relevant racial data'" to determine legal compliance. *Id*. at 51.

In indicating what crosses the line from permissible references to racial statistics to improper use of race as a districting criterion, the *Callais* Court cites *Alexander*, 602 U.S. at 6. *See Callais*, 146 S. Ct. at 1159. In turn, *Alexander* holds

---

[4] This opinion is docketed in these cases at Doc. 77-2 in No. 25-13007, and Doc. 45-2 in No. 25-14131.

that legislatures may not give "race a predominant role in redistricting decisions," 602 U.S. at 6, but that "view[ing] racial data" or "aware[ness] of racial demographics" is acceptable so long as it is not a criterion in the drawing process, *id*. at 22. By the same token, a cartographer does not cross the line merely because he develops a general awareness of where a minority population is located. To the contrary, map drawers "will . . . almost always be aware of racial demographics." *Id*. (citation modified); *see also Callais*, 146 S. Ct. at 1159 (citing *Alexander,* 602 U.S. at 6) with approval on a related point). Under the properly articulated standard, Plaintiffs' map-drawer did not impermissibly use race as a criterion.

The district court found that while Mr. Fairfax knew "where the minority community exist[ed]" at the beginning of the process—as any mapmaker would— he did not display racial data or rely on race in drawing Illustrative District 25. Op.168. Indeed, "there is nothing nefarious about [a cartographer's] awareness of the State's racial demographics" and it is "entirely unsurprising that [a cartographer] exhibit[s] a wealth of knowledge about who lives in which part of the State." *Alexander*, 602 U.S. at 37. The district court properly credited Mr. Fairfax's unequivocal testimony that he "turn[ed] [racial data] off" when drawing maps. Op.168; *see Alexander*, 602 U.S. at 37 (chastising a district court for failing to credit similar testimony merely because an expert had to "consume racial data to comply with [VRA] precedents") (internal alterations omitted). Like in *Alexander*, Mr.

Fairfax merely "later checked the minority BVAP and BCVAP" to see if he met the "sufficiently large component" of the first *Gingles* precondition, Op.168, as is permissible, *see Alexander*, 602 U.S. at 22; *see also Milligan* 3d PI at 52 (finding that map-drawer did not impermissibly use race under Callais where she "'periodically checked to see if the plan, as a whole, had that property of two majority-Black districts,' in order to comply with the numerosity requirement of *Bartlett*"). Alabama's cartographer used a similar process to draw the Enacted Plan. Op.21, 93. And the Secretary's trial expert never alleged that Mr. Fairfax improperly used race in drawing Illustrative District 25. Op.170–71. This record satisfies any adjustments made by *Callais*.

The Secretary takes one of Mr. Fairfax's statements out of context (at 30) to suggest that he relies on race as a criterion during the drawing process. But Mr. Fairfax's testimony about "criteria labels" must be understood in context of his use of a districting program called Maptitude. Tr. of Bench Trial Vol.II, Doc.254 at 62–63. This program has a "data view" feature that can display redistricting criteria such as "the total population, the population deviations," and more, along with other data on "population characteristics" including racial data. *Id.* When asked about relying on racial data, he responded that "[he] tend[s] to not consider race as much as the other criteria," clarifying that *before* he begins drawing, he "will look at where the minority community exists" because map drawers "have to have some sense of

where the minority community is" to know whether they might be able to "meet []

*Gingles* 1." Doc.254 at 23–24; *accord Alexander*, 602 U.S. at 37. But then he "turn[s]

it off and won't turn it on," except later to check whether the map satisfies the

*Bartlett* numerosity requirement. Doc.254 at 24. Mr. Fairfax confirmed that "if

someone were standing over [his] shoulder watching the process of developing this

map," they would *not* see racial data because it "would be off screen." Doc.254 at

63. Thus, Mr. Fairfax conducted himself exactly as did Alabama's own map-drawer,

Mr. Hinaman, who was extremely familiar with the location of various racial groups

in Alabama, and reviewed "the racial makeup of the districts after the Plan was

completed." Op.16.

Plaintiffs' map-drawer's limited reference to racial data to satisfy *Bartlett*

rather than as a criterion while drawing the map does not run afoul of *Callais*. This

is to be expected where the district court found that "the Secretary did not adduce

*any evidence*, let alone sufficient evidence, that race predominated in the preparation

of Proposed District 25." Op.171.

### B. Based on the Record, the District Court Correctly Found That the Illustrative District Meets All of the State's Legitimate Districting Objectives.

The *Callais* Court confirmed that "illustrative maps must meet all the State's

legitimate districting objectives, including traditional districting criteria . . . ."

*Callais*, 146 S. Ct. at 1159. Here, the district court did not err in finding that

Plaintiffs' Illustrative District 25 satisfied the State's own stated redistricting criteria. *See* Op.165–67. The Legislature drew the 2021 Senate map based on redistricting guidelines passed by the Committee. Op.93–95. Both Senator McClendon, the Committee Chair overseeing the Senate map, and Randy Hinaman, the Committee's longtime cartographer who drew the 2021 map, testified that the guidelines governed the State's map drawing process. *Id.* The 2021 guidelines "cover . . . how the Committee considered traditional districting criteria." Op.13; *see also* Op.250–52 (reproducing the guidelines). The State set two tiers of priority: first, they "prioritized population equality, contiguity, compactness, and avoiding dilution of minority voting strength," and "encouraged, as a secondary matter, avoiding incumbent pairings, respecting communities of interest, minimizing the number of counties in each district, and preserving cores of existing districts." Op.13 (quoting *Milligan*, 599 U.S. at 15).

The Secretary's "sole argument about the configuration of Proposed District 25 [was] that the illustrative district is not reasonably configured because it 'subordinates traditional districting principles to racial considerations.'" Op.166. That is, he never contested that Mr. Fairfax's plan satisfied every other state guideline. *Id.*; *see also* Op.153 (noting that Alabama's expert "did not analyze whether [Plaintiffs'] plan respects political subdivisions, observes natural boundaries, preserves the cores of districts, or pairs incumbents"). Indeed, the Court

25

noted that Mr. Fairfax followed the State's guidelines and that his plan met or, at times, beat the 2021 map on their criteria. Op.165–67. For instance, Plaintiffs' "Proposed District 25 received better compactness scores on" three different measures "than did District 25 in the Enacted Plan." Op.165–66. And Plaintiffs' plan "actually removed a county split" in District 25 and accordingly "outperforms the Legislature's Enacted Plan." Op.169. By all accounts, the district court correctly concluded that "Mr. Fairfax deferred to the Legislature's priorities" when drawing Illustrative District 25. *Id.*

Each of the Secretary's arguments to the contrary fails. *First*, the Secretary complains (at 31) that Mr. Fairfax failed to "achieve" the State's objectives simply because he dared to testify that he gave certain objectives—like equal population, compactness, and contiguity—the highest priority. But, as the district court and the Supreme Court have found, such a hierarchy *literally was* the State's express aim. Op.13 ("The guidelines 'prioritized population equality, contiguity, compactness, and avoiding dilution of minority voting strength,' and 'encouraged, as a secondary matter,' [additional criteria].") (quoting *Milligan*, 599 U.S. at 15).

*Second*, the Secretary contends (at 31–32) that Plaintiffs' Montgomery area maps "clear[ly] fail[ed]" to respect Alabama's "aim[] to protect incumbents and their districts, so that voters are familiar with those people running for office." (citation omitted). Not so. The Guidelines do not call for incumbent *protection* but rather, as

26

a lower tier goal, "avoiding incumbent *pairings*." Op.13 (emphasis added). Plaintiffs' Illustrative Plan paired only two incumbents in one district (Senate District 9), but that pairing was related to Plaintiffs' other challenge to a district in the Huntsville area and entirely unnecessary to their map in Montgomery. *See* Fairfax Expert Report, Doc.206-6 at 39. Because Plaintiffs did not prevail on their Huntsville claim before the district court, that district—and the related pairing of incumbents—is not at issue in this appeal. To the contrary, the Illustrative Plan's new SD 25 results in no incumbent pairings in the Montgomery area. Doc.206-6 at 39. Moreover, the incumbents in the Montgomery area remain favored to win re-election in both redrawn remedial districts. *See* Doc.322 at 12–13 (Republicans are favored to win in remedial District 26); *see also* Doc.312 at 20-21 (Republicans win the new District 26 on average by 1.8 percentage points).

*Third*, the Secretary bemoans in passing (at 33) that Illustrative District 25 "created a new city split in Prattville." Yet there is no evidence in the record that avoiding splitting Prattville was a priority for the Legislature. For that unsupported proposition, Defendant's brief cites (at 33) a paragraph from his own proposed findings of fact that merely states that a split in Prattville occurred. Nothing in *Callais* requires Plaintiffs to meet post hoc demands that did not *actually* govern the Legislature's map-making process. *See* 146 S. Ct. at 1156–57; *cf. also Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017) ("The racial predominance

inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not."). In any event, by making whole other towns that the *state itself* split—like Pike Road—and by "remov[ing] a county split" in Elmore County, "the configuration of Proposed District 25 reflects that Mr. Fairfax deferred to the Legislature's priorities of avoiding city and county splits." Op.169. Notably, the Secretary presented several witnesses who testified to the cohesive, unique community in Pike Road, *see* Op.137–41, but offered no such evidence related to Prattville. Mr. Fairfax better adhered to the Legislature's own communities-of-interest criterion than Mr. Hinaman, who testified that he did not make any effort to keep any specific communities of interest together, nor was he instructed to do so. Doc.235-2 at 75.

Defendant's counterargument (at 33 n.13)—that *every* line-drawing decision by a state is a "constitutionally permissible consideration" that therefore cannot be changed—is nonsensical. If such a granular level of inquiry were required, all redistricting claims would be nonjusticiable, as it would mean the only permissible map would be the *exact map* enacted by the state. Rather, the district court "correctly" rejected this argument, as "[t]here would be a split . . . in both" the "plaintiffs' map[] and the State's." *Milligan*, 599 U.S. at 21.

*Fourth*, the Secretary complains (at 33) that Plaintiffs' plan "subordinated 'communities of interest'" based on his unsuccessful argument that Mr. Fairfax combined both urban and rural communities in a Montgomery-area district. The district court expressly rejected this argument because Mr. Fairfax's plan included fewer rural areas joined with parts of the City of Montgomery by stopping District 25 at the Elmore County line, and his inclusion of rural Crenshaw County was identical to the State's own map. Op.169; Jnt. Statement of Undisputed Facts, Doc.230 at ¶ 65.

*Fifth*, the Secretary argues on appeal that the enacted plan prioritized "preserving the cores of the existing districts," and he speculates that "Mr. Fairfax did not follow [that criterion] explicitly." Doc.251 at 33. This argument fails for several reasons. For one, the Secretary did not raise this issue to the district court, *see* Doc.251, so it has been "waived," *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009). Next, it is factually wrong—Mr. Fairfax respected this criterion and testified that "both the Illustrative and Enacted Plans are largely comparable in their preservation of the district cores of the previous plan configuration used in 2020." Doc.206-6:39 n.32. That testimony was unopposed, as the Secretary's expert "did not analyze whether [the illustrative] plan respects political subdivisions, observes natural boundaries, preserves the cores of districts, or pairs incumbents." Op.153.

Finally, the Supreme Court rejected this exact "core retention" argument when Alabama raised it just three years ago. *Milligan*, 599 U.S. at 22 ("[T]his Court has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan."). Nothing in *Callais* "overruled" that recent holding. 146 S. Ct. at 1162 (declining to overrule *Milligan*).

Accordingly, the district court's conclusion that Illustrative District 25 satisfied the State's own stated redistricting criteria remains undisturbed by *Callais*.

**C. The Secretary Did Not Defend the Map on Partisanship Grounds and the Record Does Not Reflect Partisanship as a Goal of the Plan.**

Notably absent from the Secretary's briefing on Alabama's districting objectives is any argument about partisan goals. That is because here, as in *Milligan*, "the State did not defend its map on the ground that it was drawn to achieve a political objective." *Callais*, 146 S. Ct. at 1162.

The record contains no evidence of members of the Legislature asserting any partisan objectives as motivating the district lines in the 2021 Plan, and the legislative redistricting guidelines did not reference partisanship. Op.14–15. To the contrary, Alabama leaders expressly disclaimed any partisan motive in drawing the 2021 Plan. Senator McClendon, the Committee Chair who oversaw the drawing and enactment of the 2021 Plan, testified that partisanship was *not* a factor in drawing

the Enacted Plan and that the Plan was drawn *without even looking at political data*. Doc.235-1 at 28–29. Plaintiffs therefore had no duty to meet a goal that Alabama itself never set or tried to advance. Rather, Mr. Fairfax closely followed the State's Guidelines and redistricting criteria when drawing Plaintiffs' plans. Op.165–171.

Plaintiffs' illustrative map satisfies the updated first *Gingles* precondition.

**II.    Plaintiffs Satisfy *Gingles* 2 and 3 by Disentangling Racial and Political Affiliation in Voting Patterns.**

The district court correctly found that there was extensive quantitative and qualitative evidence decoupling race and party such that "it [could not] understand the [voting] patterns it sees as mere party politics." Op.196. Rather, the "racial cleavages in voting patterns in Alabama" are more "appropriately described as racially polarized voting," than voting based on political affiliation. Op.196–97. It is "race [that] is the core driver of voting behavior and election results in Alabama," and neither "Alabama's stark patterns of racial bloc voting, nor the extreme electoral failures of Black-preferred candidates" can be attributed "to party politics." *Milligan* 3d PI at 61.

Under *Callais*, Section 2 Plaintiffs "must show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." 146 S. Ct. at 1159. The Supreme Court pointed to the "facts of *Gingles*" itself as "a good example of how a § 2 plaintiff can properly meet these preconditions." *Id*. Specifically, the Court cited

the different voting patterns that Black and White voters had "*within* the Democratic party." *Id*. (citing *Gingles*, 478 U.S. at 59).

Thus, showing an "intra-party racial-bloc voting pattern helps to demonstrate that the minority plaintiffs have 'less opportunity' than their majority counterparts because of race, not just because of partisan affiliation." *Callais*, 146 S. Ct. at 1159 (quoting 52 U.S.C. § 10301(b)). The district court's opinion and the record contain ample evidence of racial voting patterns and lack of equal opportunity for Black candidates, regardless of party.

At the outset, the Secretary never disputed Plaintiffs' evidence that Black and White voters vote tend to vote for different candidates, and the court found "an overwhelming preponderance of the evidence that Black voters in Alabama are 'politically cohesive,' and that Montgomery's '[W]hite majority votes sufficiently as a bloc to enable it . . . to defeat the [Black] preferred candidate.'" Op.174 (quoting *Milligan*, 599 U.S. at 18.). This remains a necessary, though not sufficient, part of Plaintiffs' burden under the second and third *Gingles* preconditions set out in *Callais*. *See* 146 S. Ct. at 1159 (describing "the second and third preconditions" as "politically cohesive voting by the minority and racial-bloc voting by the majority").

The record contains, and the court found, extensive evidence disentangling race from party across primaries, non-partisan elections, and from witness testimony.

First, Plaintiffs' expert Dr. Liu provided uncontested analysis showing that two recent (2019 and 2023) nonpartisan, biracial mayoral races in Montgomery still had significant racially polarized voting despite the lack of a party cue.[5]

Second, the record contains evidence of significant racially polarized voting in primary elections in both parties. For example, the Secretary's expert Dr. Hood testified that, in Alabama there was significant racially polarized voting in the 2008 Democratic primary between Barack Obama and Hillary Clinton. Pls.' Post-Trial Proposed Findings of Fact & Conclusions of Law, Doc.250 at ¶ 454. Dr. Hood also admitted that, in the 2008 *general* elections for both President and U.S. Senate that year, a majority of White Democrats in Alabama voted for White *Republicans* rather than Black Democrats. Doc.250 at ¶ 454; *see also* Doc.258 at 84.

On the Republican side, the Court cited the "election of one Black Republican from one majority-White district in 150 years," Op.191—an occurrence that even the Secretary's expert called "rare," Op.189. The court also credited undisputed evidence that "no elected Black officials serve in a statewide office," and that "Black Republican candidates in *many* 2024 primary elections garnered less than ten percent

---

[5] The Secretary's expert Dr. Bonneau noted that in some nonpartisan elections voters may still know the partisan identification of a candidate, but "he did not evaluate whether the candidates in the mayoral races Dr. Liu evaluated were correlated to a party." Op.118–19; *see also* Doc.259 at 114–16 (admitting these races "showed starkly racially-polarized voting even without partisan cues on the ballot" and that Dr. Bonneau has cited literature showing that "for mayoral elections[,] removing partisanship from the ballot essentially eliminates the relationship between voters' party identification and vote choice" and has no information to suggest that such a finding is not true).

of the vote." Op.183; *see also* Op.192–94 (detailing five Republican primaries and explaining that the evidence "suggests that White Republicans are not willing to support minority candidates in large numbers" even in Republican primaries). For example, in the 2024 Republican primary for congressional district two, "four Black candidates finished behind the four White candidates, and the four Black candidates 'together received only 6.2% of the total vote.'" Op.193 (citation omitted).

Third, this "record demonstrates a near-total absence of Black Alabamians in statewide office and legislative office (outside of Black-opportunity districts)," Op.190–91, and that "no elected Black officials serve in a statewide office," Op.183. The Secretary's own expert, Dr. Bonneau, testified that "race is likely a reason why some African-American candidates in Alabama do not have electoral success." Trial Tr. Vol.VII, Doc.259 at 142–43; *see also* Op.189–90. Even after the "partisan realignment" in Alabama in the past couple of decades, *see Callais*, 146 S. Ct. at 1158 ("a full-blown two-party system has emerged in the States where § 2 suits are most common"), White Democrats have won three statewide offices and multiple congressional seats in majority-white districts, while Black Democrats have won none of these. *See* Doc.259 at 139–140. All this evidence led the court to find that it could not reconcile the proposition "that White voters are willing to support minority candidates in large numbers with political reality." Op.192. This finding is consonant with the evidence in *Gingles* that the *Callais* Court found convincing: elections

showing "a substantial majority of white voters [] rarely, if ever, vot[ing] for a black candidate." *Gingles*, 478 U.S. at 59; *see also Callais*, 146 S. Ct. at 1158 (citing this part of *Gingles*).

Fourth, the court heard and credited testimony from candidates, elected officials, and voters showing that race "is a driving factor" in voting patterns in Alabama. Op.194. Two witnesses called by the Secretary, Valerie Branyon and Bill McCollum, both Black Republicans, testified about receiving support from Black Democrats (in the case of Ms. Branyon), Doc.256 at 131–32, and about Black voters generally supporting Black candidates regardless of party (from Mr. McCollum), Trial Tr. Vol.VI, Doc.258 at 217. Senator McClendon also testified that, that in his experience, Black voters tend to vote for Black candidates. Doc.235-1 at 78.

The Secretary argues (at 36) that the district court engaged in improper burden flipping by requiring "the Secretary to demonstrate that 'only party politics are at work.'" But the quotation cited by the Secretary refers to the court's consideration and rejection of arguments that it found contrary to the evidence in the case. Op.188–92. The court did not depend upon the rejection of the Secretary's arguments to make its findings about the predominant role of race over party, however, citing evidence in the record elicited by Plaintiffs, by stipulations, and even from the Secretary's own witnesses. *See* Op.193–95, 197-98.

Additionally, the Secretary takes out of context (at 37) the court's statement that it "cannot separate voters' racial considerations from their party affiliations" in Alabama, to imply that Plaintiffs failed to disentangle the two factors. Op.196. The court did not imply that this was a situation where race was just "correlated with party preference," such that plaintiffs were "exploit[ing] § 2 for partisan purposes." *Callais*, 146 S. Ct. at 1158. Rather, the court was explaining that racial issues and considerations drive partisan affiliation in Alabama, not the other way around. And in any event, the Secretary's cherry picking omits the district court's accompanying findings that it "cannot understand the patterns it sees as mere party politics" and that "when it looks at racial cleavages in voting patterns in Alabama, what it sees is appropriately described as racially polarized voting." Op.196–97.

The court considered but rejected much of the attempts to rebut these showings by the Secretary's experts. It found that the testimony of Dr. Hood did "not match reality in Alabama," noting that it was undermined by his own scholarship, that, for example, "race was and is a driving force behind party politics" in Alabama and the region. Op.182–83. These findings carry weight because this Court gives "particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony." *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983).

Additionally, the court found that the political parties' positions on key issues like abortion and same-sex marriage did not explain the voting patterns of Black voters. Rather, Black voters and White voters in Alabama both oppose same-sex marriage and abortion in roughly equal numbers, but these shared political positions are not reflected in their voting patterns. Op.194.

The court's opinion and the record contain more than enough evidence to meet the updated *Gingles* 2 and 3 standards.

## III. Based on Recent Evidence of Intentional Discrimination in Voting and Current Conditions in Alabama, Plaintiffs Satisfy the Totality of Circumstances Test Updated by *Callais*.

*Callais* updated Section 2's totality-of-circumstances inquiry such that courts must give greater weight to evidence bearing on "present-day intentional racial discrimination regarding voting," and less weight to older discrimination and present-day disparities characterized only as the lingering effects of societal discrimination. 146 S. Ct. at 1160. It clarified, though, that plaintiffs still need not prove discriminatory intent—rather, they "must show that a districting scheme denies members of a racial group the same 'opportunity' as other voters to elect the candidates they prefer," such that the evidence "give[s] rise to a strong inference of racial discrimination." *Id*. at 1162. Here, the contemporary voting-specific evidence and other current data bearing on intentional discrimination still satisfies this updated totality-of-circumstances test after *Callais*, revealing a political system in

Alabama that is not equally open to Black voters because it denies them equal opportunities to elect preferred candidates. Rather, the "intensely local corpus of evidence tells us the same thing" about current official racial discrimination: "things are still different here in Alabama." *Milligan* 3d PI at 69.

In *Callais*, the Supreme Court held that the record did not "show[] even a plausible likelihood of intentional discrimination by the State" and focused on older evidence with little connection to current conditions. 146 S. Ct. at 1162. The record in that case contained only a single recent VRA violation from the last decade and largely focused on instances of discrimination from the 1960s. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 846 (M.D. La. 2022), *vacated and remanded*, 86 F.4th 574 (5th Cir. 2023). Here, there are multiple recent incidents of discrimination. The district court found that Alabama's "pervasive and protracted history of official discrimination in voting rights" has "run well into the present era," citing numerous decisions by federal courts finding official, intentional discrimination in voting over "last ten years" and issued "by federal judges who remain in service today." Op.204.

For example, the district court relied on recent redistricting-specific evidence from 2023 and 2017. In 2023, the Supreme Court affirmed that Alabama's 2021 congressional plan violated the VRA. Op.200–01 (citing *Milligan*, 599 U.S. at 22). In 2017, after the 2010 Census, a court found that the Alabama Legislature drew twelve unconstitutional racially gerrymandered legislative districts. *Id*. (citing *Ala.*

*Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1348–49 (M.D. Ala. 2017)). The court also cited evidence that, in 2011, Alabama State Senators and legislators conspired to suppress Black voter turnout by keeping off the ballot a referendum issue that was popular among Black voters—whom the senators called "Aborigines." Op.203–04 (citing *United States v. McGregor*, 824 F. Supp. 2d 1339, 1345–47 (M.D. Ala. 2011)). It noted two recent decisions in which courts entered consent decrees in challenges to discriminatory at-large voting systems created by the Alabama Legislature. Op.202 (citing *Jones v. Jefferson Cnty. Bd. of Educ.*, No. 19-CV-01821, 2019 WL 7500528, at *2, *4 (N.D. Ala. Dec. 16, 2019)); *Ala. State Conf. of the NAACP v. City of Pleasant Grove*, No. 18-cv-02056, 2019 WL 5172371, at *1 (N.D. Ala. Oct. 11, 2019)). Moreover, in the past twelve years, Alabama had the nation's most political subdivisions bailed into preclearance under Section 3(c) of the VRA due to intentionally discriminatory voting practices.[6] Op.202–03.

The court further relied on recent racial appeals made by candidates running for statewide offices as additional evidence of present-day discrimination. *See* Op.217–18. There was also evidence that elected officials and campaign operatives

[6] *See, e.g.*, *Braxton v. Town of Newbern*, No. 2:23-CV-00127-KD-N, 2024 WL 3519193, at *2–3 (S.D. Ala. July 23, 2024) (agreeing to a settlement with the bail-in remedy after the court found that plaintiffs were "likely to succeed on the merits" of their constitutional right to vote claim); *Jones*, 2019 WL 7500528, at *2 (agreeing to bail-in based on expert reports and stipulated facts); *Allen v. City of Evergreen, Ala.*, No. 13-107, 2013 WL 1163886, at *1 (S.D. Ala. Mar. 20, 2013) (finding that the plaintiffs had proven the "indicia of [intentional] discrimination" sufficient to entitle them to a preliminary injunction), judgment entered 2014 WL 12607819, at *1 (S.D. Ala. Jan. 13, 2014) (adopting bail-in remedy).

had overtly appealed to Confederate sympathizers, defended White Nationalists as "not racist," Op.78–79, and used of images associated with "White Supremacy" to get out the vote, Op.145. Such racial appeals "can be very significant if . . . present." *United States v. Marengo Cnty. Comm'n*, 731 F. 2d 1546, 1571 (11th Cir. 1984).

Beyond just voting cases, the Court relied on other evidence of "current conditions" involving discrimination in other areas that affect Black voters' opportunity to participate in the political process on equal terms. *Callais*, 146 S. Ct. at 1162 (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 553 (2013)). For example, in 2018, in a case challenging the attempt by the City of Gardendale, which is 85% White, to form a school district separate from Jefferson County, this Court affirmed a finding that "race was a motivating factor" in the city's effort. *Stout ex rel. Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1000, 1009 (11th Cir. 2018). There was similar evidence of official intentional discrimination in various areas in the Montgomery area in recent years. Doc.250 at ¶¶ 354–59; *see, e.g.*, *Weatherly v. Ala. State Univ.*, 728 F.3d 1263 (11th Cir. 2013) (employment); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1167–70 & n.3 (11th Cir. 2010) (same); *Bui v. Haley,* 321 F. 3d 1304 (11th Cir. 2003) (juries); *Godby v. Montgomery Cnty. Bd. of Educ.*, 996 F. Supp. 1390, 1411 (M.D. Ala. 1998) (education); *United States v. Montgomery*, 948 F. Supp. 1553, 1570 (M.D. Ala. 1996) (employment).

Similarly, the Court credited evidence that "Black Alabamians' lower educational attainment is traceable to segregated public schools and dilapidated schools in predominantly-Black areas," Op.208, and that the effect from this discrimination was lower turnout, Op.209–10. This evidence is not "decades-old data" unrelated to "current conditions," *Callais*, 146 S. Ct. at 1162—the Court credited unrebutted expert testimony that close to 40% of the votes cast in 2020 were by people who "were at least school age in 1965, which means they were partially educated during a time when Alabama still had segregated public schools." Op.209. Thus, official discrimination in education is still impacting the ability of many Black voters to participate in the political process on equal terms, and educational discrimination continues today, *see, e.g.*, Op.208, 203 (citing evidence of "segregated public schools and dilapidated schools in predominantly-Black areas" and noting that "the state did not satisfy its obligations to remedy the vestiges of segregation [in the area of school facilities] under [a statewide school desegregation] order until as late as 2007").

The Secretary attempts (at 39–41) to identify statistics he believes undermine Plaintiffs' totality showing. The Secretary points to Black voter registration statistics, but ignores the evidence of racial turnout disparities, including gaps of up to 13% in the relevant counties near Montgomery, Doc.255 at 214–19, and unrebutted testimony that turnout is a better estimate of political participation than

registration rates, Doc.255 at 216. Moreover, the Secretary cites the increase in the number of Black legislators in Alabama over time, but as his expert Dr. Hood agreed, thirty-two of Alabama's thirty-three Black legislators were elected from majority-Black districts and "[a]t least some" changes in Black representation were due to litigation that created majority-Black districts like those the Secretary now seeks to erase. Op.134; Doc.258 at 94–96. Likewise, the parties stipulated that there are no Black statewide elected officials in Alabama, that only one Black candidate has ever won a contested statewide election in Alabama, that all Black Senators and all but one Black House member were elected from majority-Black districts, and that, since the start of the twentieth century, Alabama has never elected a Black person to Congress outside of a single majority-Black district that was created by court order. Op.197; *see also* Doc.230 at ¶¶ 93–94, 102, 117.

Moreover, the Secretary ignores and does not challenge the credibility findings the Court made, finding Plaintiffs' experts in political participation and recent discrimination "credible and helpful." Op.180–81. By contrast, regarding his expert in this area, Dr. Reilly, the Court gave "very little weight" to his opinions because they were not focused on Alabama, offered opinion testimony without support, and "was dogmatic, defensive, and deliberately confrontational." Op.184–85. For example, the court noted that Dr. Reilly's reliance on Wikipedia and other sources and his attempt to explain his social media posts relating to his scholarship

both diminished his credibility, including his explanation of his post "that 'people in the hood' understand the 'same taste[s] and drives' as Neanderthal rapists." Op.185.

The Secretary also cites (at 41) a portion of another district court decision from over a decade ago concerning a different region in Alabama, *Ala. Legislative Black Caucus v. Alabama* ("*ALBC*"), 989 F. Supp. 2d 1227, 1280–87 (M.D. 2013)). There, a court rejected a Section 2 claim against some of Alabama's 2012 state legislative districts for not meeting the first *Gingles* precondition. 989 F. Supp. 2d at 1281–83. The *ALBC* court's finding on this point resolved that claim. But the Secretary cites the portion of *ALBC* where the court, writing briefly in dicta, found that the plaintiffs failed to prove unequal opportunity in the political process. *Id*. at 1285–87.

But the records of these cases could not be more distinct. For one, in the decade since the *ALBC* decision, federal courts have issued numerous decisions finding that Alabama has violated the VRA or the constitutional rights of Black voters. Op.200–04. Further, the *ALBC* plaintiffs presented no evidence on racial appeals or a lack of responsiveness and the court there found the *ALBC* plaintiffs' expert did not focus sufficiently on localized evidence in Alabama. 989 F. Supp. 2d

43

at 1286–87. Here, however, the court here cited significant evidence on these issues and credited Plaintiffs' experts based on their localized perspective.[7] Op.207–10.

*Callais* does not wipe away the record in this case. It changes the weight assigned to certain evidence. But when that reweighing is done here, the result remains the same. Unlike the remote historical record rejected in *Callais*, the court relied on Alabama's recent record of intentional discrimination in voting and redistricting that provides the necessary inference of discrimination where the "Enacted Plan unlawfully diluted Black votes by packing Black voters into District 26." Doc.322 at 17.

Plaintiffs' evidence satisfies the totality of circumstances inquiry as *Callais* now frames it.

## IV. If the Court Chooses Not to Affirm and Believes the District Court Needs to Evaluate the Record in Light of *Callais* in the First Instance, It Should Remand Without Vacatur.

The Secretary "prefers" that this Court vacate and remand without evaluating the merits because "it can be done quickly, and absent swift action, Alabama will be forced to conduct the 2026 elections under an injunction." Br.21–22. But that is not sufficient to justify vacatur. Here, the Court is capable of evaluating the case on the

---

[7] In contrast, the court found that the Secretary's expert, Dr. Carrington, showed a "willingness to opine about Alabama without first learning about Alabama" and found that he showed a "carelessness" and "lack of relevant expertise" on Alabama that "foreclose[d] the Court's reliance on his testimony." Op.187.

merits, or if it believes it is not, it should remand without vacatur because vacating when it is too late to change maps for this election would be contrary to the public interest.

First, the Supreme Court in *Callais* did not "require abandonment of the *Gingles* framework"—rather, the Court sought to "update the framework." *Callais*, 146 S. Ct. at 1157. As such, this Court recently declined to vacate and remand in another redistricting action in *Alpha Phi Alpha Fraternity, Inc. v. Secretary, State of Georgia*, indicating that this Court is readily able to review any altered legal analysis required to address Appellees' entitlement to the injunctions below under *Callais* with the benefit of the Parties' briefing. No. 23-13914, Doc. 182 (11th Cir. May 8, 2026).

Nor is the Supreme Court's vacatur and remand in *Milligan* determinative here. *See Allen v. Caster*, No. 25-243 (U.S. May 11, 2026) (vacating and remanding "for further consideration in light of *Louisiana v. Callais*."). Because the Supreme Court's decision affected a number of cases, it was not in a position to reevaluate all of the records on the merits, so it chose the limited type of vacatur that left courts below "free to adopt any or all of" its prior findings upon reconsideration. *United States v. M.C.C. of Fla., Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992).

Second, if the Court does determine that remand is appropriate so that the district court may evaluate the record against *Callais* in the first instance, it should

45

do so without vacatur. Because vacatur is a type of equitable relief, the Court "must also take account of the public interest." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994). This Court has the authority to do so under 28 U.S.C. § 2106, which allows appellate courts to "remand the cause and . . . require such further proceedings to be had as may be just under the circumstances."

Here, Alabama's primary election under the remedial map took place a week ago. *See supra* n.2. And testimony from recent proceedings in *Milligan* from the Secretary's office established that the August 11, 2026, special election primary set (though pending challenge) for certain congressional districts is the last possible date to do so in time for the general election. *See* Sec'y of State 30(b)(6) Dep., 11thCirDoc.77-3. And even to accomplish that, local election officials in Montgomery and Elmore Counties would need to reassign voters over a window of only six days that fall between May 27 (tomorrow) and June 2. *Milligan* 3d PI at 8–9. And prior testimony from the Secretary was that voter reassignment in Montgomery County would take approximately three months, not less than a week. *See* 11thCirDoc.77-3 at 164:18–22.

Therefore, vacatur would leave Alabama without a State Senate map under which it could hold elections next year. Creating this sort of chaos is certainly not in the public interest, as this Court and the Supreme Court have recognized. *See, e.g.*, *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th

Cir. 2015) (equitable considerations such as "the disruptive consequences of an interim change that may itself be changed" weighed against vacatur). The Supreme Court has repeatedly warned against intervening in ongoing elections. *See, e.g.*, *North Carolina v. Covington*, 583 U.S. 1109 (2018) (mem.) (declining to stay a court-ordered remedial redistricting plan adopted before an election); *McCrory v. Harris*, 577 U.S. 1129 (2016) (mem.) (same). Recently, in *Moore v. Harper*, 142 S. Ct. 1089 (2022) (mem.), the Court left in place a court-ordered map, declining to reinstate North Carolina's map even though it had accepted granted certiorari. *See also id.* (Kavanaugh, J., concurring) ("In light of the *Purcell* principle and the particular circumstances and timing of the impending primary elections in North Carolina, it is too late for the federal courts to order that the district lines be changed for the 2022 primary and general elections . . . ."). In *Frank v. Walker*, 574 U.S. 929, 929 (2014), the Supreme Court vacated an appellate court's stay and reinstated a district court's injunction against a state election law when ballots had already been printed and mailed under that injunction. And, in *Moore v. Brown*, after the Supreme Court vacated and remanded a prior court-ordered remedial plan in light of *Mobile v. Bolden*, 446 U.S. 55 (1980), the district court on remand entered a new injunction to maintain the status quo of the court-ordered remedial plan ahead of an impending election. 448 U.S. 1335, 1338 (1980). Because it was too late to restore the old plan,

Justice Powell let the court-ordered plan remain in place for the upcoming election. *Id*. at 1340-41.

The cases discussed by the Secretary (at 19–20) for the proposition that the Court should vacate and remand occurred under materially different circumstances, in which vacatur would not immediately affect the status quo and disrupt an ongoing election. In *Dillard v. City of Greensboro*, 74 F.3d 230, 236 (11th Cir. 1996), this Court vacated and remanded solely the district court's remedial order to reexamine it in light of intervening case law, and there is no indication that doing so interfered with an ongoing election. In *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 273–75 (2015), the Supreme Court vacated and remanded because it had noted four different errors in legal analysis made by the district court, not because of a change in the law. And in *Thomas*, this Court remanded "for the limited purpose of addressing "the district court's decision on equitable tolling, and not the district court's judgment on the merits," after a change by the Supreme Court to the equitable tolling test. *Thomas v. Att'y Gen., Fla.*, 795 F.3d 1286, 1297 n.3 (11th Cir. 2015). Because the Plaintiff had lost on this issue below, this Court's vacatur did not alter the status quo while the district court reconsidered it.

Therefore, if the Court decides to allow the district court to hear the merits in the first instance, it should do so without vacatur.

**CONCLUSION**

For the foregoing reasons, the Court should affirm the district court's judgment, or in the alternative, remand without vacatur with instructions to reconsider whether the injunction stands in light of *Callais*.

DATED this 26th day of May 2026.

Deuel Ross
NAACP Legal Defense &
Educational Fund, Inc.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
dross@naacpldf.org

Stuart Naifeh
Kathryn Sadasivan
Brittany Carter
Colin Burke
NAACP Legal Defense &
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
 (212) 965-2200
snaifeh@naacpldf.org
ksadasivan@naacpldf.org
bcarter@naacpldf.org
cburke@naacpldf.org

Alison Mollman
American Civil Liberties Union
of Alabama
P.O. Box 6179
Montgomery, AL 36106-0179

Respectfully submitted,

*/s/ Davin M. Rosborough*
Davin M. Rosborough
Dayton Campbell-Harris
Theresa J. Lee
Sophia Lin Lakin
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
 (212) 549-2500
drosborough@aclu.org
dcampbell-harris@aclu.org
tlee@aclu.org
slakin@aclu.org

Jacob Van Leer
American Civil Liberties Union
Foundation
915 15th St. NW
Washington, DC 20005
jvanleer@aclu.org

Bradley E. Heard
Jack Genberg
Southern Poverty Law Center
1101 17th Street NW, Suite 550
Washington, DC 20036
(240) 890-1735
bradley.heard@splcenter.org

(334) 265-2754
amollman@aclualabama.org

David Dunn
HOGAN LOVELLS LLP
390 Madison Avenue
New York, NY 10017
(212) 918-3000
david.dunn@hoganlovells.com

jack.genberg@splcenter.org

Jessica L. Ellsworth
Jo-Ann Tamila Sagar
Amanda NeCole Allen
HOGAN LOVELLS LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

***Attorneys for Plaintiffs-Appellees***

## CERTIFICATE OF COMPLIANCE

I certify that this letter complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B)(i). The body of the letter contains 11,650 words. This letter complies with the typeface and style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: May 26, 2026

/s/<em>Davin Rosborough</em><br>
Davin Rosborough<br>
Counsel for Appellees

## CERTIFICATE OF SERVICE

I certify that on May 26, 2026, I served a copy of the foregoing on all counsel of record by CM/ECF.

/s/<em>Davin Rosborough</em><br>
Davin Rosborough<br>
Counsel for Appellees